688 So.2d 1201 (1997)
Sonya Johnson WILLIAMSON, et al.
v.
HAYNES BEST WESTERN OF ALEXANDRIA, Mr. and Mrs. H.L. Haynes, Individually, Best Western International, Inc., American General Fire and Casualty Company, Transamerica Insurance Company, et al.
No. 95-CA-1725.
Court of Appeal of Louisiana, Fourth Circuit.
January 29, 1997.
Rehearing Denied March 31, 1997.
*1202 Mack E. Barham, Robert E. Arceneaux, Hansel M. Harlan, Barham & Arceneaux, New Orleans, and Lawrence J. Smith, Lawrence J. Smith & Associates, New Orleans, and J. Ransdell Keene, Shreveport, for Plaintiffs/Appellants.
Campbell E. Wallace, Spyridon, Koch, Psarellis, Wallace & Palermo, Metairie, for Appellee Best Western International, Inc.
Marshall G. Weaver, Henican, James & Cleveland, New Orleans, for Appellee St. Paul Mercury Insurance Company.
Richard S. Vale, Blue Williams, L.L.P., Metairie, for Defendants/Appellees Haynes Best Western of Alexandria, Inc., American General Fire and Casualty Company, and Maryland Casualty Company.
William F. Page, Jr., Briney & Foret, Lafayette, for Appellant/Intervenor Insurance Company of North America.
Before BARRY, LOBRANO and WALTZER, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE:
Sonya Williamson claims that she was electrocuted on 21 July 1989 while attempting to turn off the light in her room in the Haynes Best Western Motel in Alexandria (HBWA). She claims to have been doing paperwork for Seahorse Farms, a family business, while in the motel.[1] The family had lived at the motel for over a month, requesting to move from room to room until settling in Room 170, where they had been living for two weeks at the time of the accident. Sonya had no burns on her body, and no entrance or exit wound. She was ultimately diagnosed as suffering from permanent spastic hemiparesis caused by organic brain damage from an electrical shock which she claims caused her to be a quadriplegic.
*1203 She sued the motel chain, Best Western International (BWI), the motel, HBWA, its owners, the Hayneses, and their insurers. Defendants defended on a claim of fraud. Best Western International (BWI) filed a third party demand against Robert T. Williamson, Sonya's husband, alleging that his actions preventing the motel staff from entering or inspecting Room 170 during the Williamsons' stay therein prevented the motel from discovering and remedying the alleged defective condition; his refusal to allow Sonya to obtain necessary medical tests and treatment jeopardized her condition.
This case was removed to United States District Court for the Eastern District of Louisiana where related cases were pending. In those related cases Robert Williamson was acquitted on charges of insurance fraud brought by the U.S. Attorney's Office in 1990; in November 1993, one of Best Western's insurers, St. Paul Mercury Insurance Co., filed a civil RICO action against Robert and others alleging a continuing pattern of insurance fraud, including the Best Western incident. That suit was pending as of the instant trial. Early in 1994, Robert was indicted on charges involving prescription fraud; the United States Attorney subsequently dismissed the charges.[2] In 1993, Lawrence Smith filed suit in United States District Court for the Eastern District of Louisiana, Sonya Williamson, et al. v. Ellis Pisciotta, et al., Civil Action No. 93-3729, alleging a conspiracy to deprive the Williamsons and others of their civil rights in violation of the federal Civil Rights Act, the federal RICO statute, the Louisiana Unfair Trade Practices Act and "other laws of Louisiana and the United States of America." In her Order and Reasons of 23 May 1994, Judge Berrigan set forth the following procedural history of the latter case:
1. In response to the Eastern District of Louisiana's requirement of a RICO statement of facts, Mr. Smith withdrew his RICO allegation on December 10, 1993;
2. Also on December 10, 1993, Mr. Smith filed a motion to remand in which he alleged that the defendants' removal of the case from state court violated Rule 11 of the Federal Rules of Civil Procedure. On March 2, 1994, Mr. Smith filed a motion to withdraw his motion to remand;
3. On December 12, 1993, Mr. Smith filed a "Supplemental and Amending Petition" adding ... plaintiffs. The additional plaintiffs are associates of Robert Williamson who have been investigated or arrested at various times, allegedly in an attempt to "get" Williamson. The pleading alleges that all of the defendants "have conspired and continue to conspire to get Robert Williamson'" and have conspired to "intimidate witnesses" into testifying falsely in the Williamson personal injury suit and the St. Paul Mercury RICO case.
4. On February 3, 1994, Mr. Smith filed a Motion for Leave to File Second Supplemental and Amending petition. In addition to the previous civil rights allegations, the Second Supplemental Petition alleged intentional infliction of emotional distress, abuse of process and a Bivens claim against all defendants. Mr. Smith dropped Earl Smith of the IRS as a defendant, but added three additional attorneys participating in the defense of the personal injury claim: Berit Reiss, Marshall Weaver, and Campbell Wallace.
5. On March 7, 1994, Mr. Smith filed a "Motion to Withdraw Second Supplemental and Amending Petition and to Dismiss St. Paul Mercury Insurance ... Without Prejudice..." By withdrawing the Second Supplemental Petition, Mr. Smith sought to dismiss attorneys Reiss, Weaver and Wallace without prejudice. The motion was filed "so as to avoid a confrontation at this time with regards to Rule 11 Sanctions [filed by the defendants]," but with "the full reservation of rights to rename all said defendants at a later date after the deposition of Don Dixon."
6. On March 28, 1994, Mr. Smith filed a Motion to Dismiss Without Prejudice all of the defendants except Pisciotta (claims adjuster), Reagan (AUSA), and Dixon (FBI). The motion also drops the claims of McCollough, Dauzat and Thompson, leaving only Sonya and Robert Williamson as plaintiffs.

*1204 7. On May 10, 1994, Mr. Smith filed the "Amended Motion to Dismiss Without Prejudice" that is the subject of this Order....
8. On May 16, 1994, Mr. Smith filed a "Motion for Leave to File Third Supplemental and Amending Petition." The third amending petition reurges the allegations contained in the earlier complaints, but it appears to do so on behalf of only the Williamsons and against only Ellis Pisciotta, Don Dixon and Larry Reagan.
The district court granted the motion to dismiss with prejudice the claims against all defendants except Maryland Casualty Company and Pisciotta, Dixon and Reagan. The court dismissed the claims against Maryland Casualty and American General Fire without prejudice, assessing against plaintiffs the costs and attorneys fees incurred by those defendants in their defense of the federal action. The court dismissed the claims of the Williamson associates with prejudice against all defendants except Pisciotta, Dixon, Reagan, Maryland Casualty and American General, and dismissed the claims against the latter defendants without prejudice. Subsequently, on defendants' Motion for Sanctions under Rule 11 of the Federal Rules of Civil Procedure, Mr. Smith was fined $10,000 and ordered to do unspecified community service.
This case was then remanded to Civil District Court for the Parish of Orleans where trial was held before a jury. The jury returned a verdict in favor of defendants, finding that although Sonya was "injured" while in the Haynes Best Western Motel, the accident was either staged or fraudulent. The Williamsons moved unsuccessfully for Judgment N.O.V. and New Trial. From the judgment on the jury's verdict for defendants, the Williamsons appeal.[3]
HBWA and its insurers answered the appeal, alleging that the trial court erred in:
1. failing to allow all thirty-eight prior claims to be admitted before the jury;
2. allowing redundant testimony by plaintiffs' medical and electrical experts;
3. failing to allow defendants to introduce impeachment evidence concerning Dr. Antoinette Appel;
4. allowing William Porter to testify as a fraud expert;
5. allowing hearsay testimony to be introduced during the testimony of Robert Williamson and William Porter;
6. allowing evidence of "brain mapping," an invalid medical test;
7. disallowing videotape prepared by Dr. Brown showing the accident could not have occurred as claimed by plaintiffs;
8. disallowing introduction of the MRA prepared by Dr. Soll and in limiting his testimony concerning that MRA;
9. disallowing and limiting testimony of Stuart Wood, defendants' economist;
10. failing to submit defendants' Jury Interrogatories to the jury.
BWI answered the appeal, contending that the trial court erred:
1. in pre-trial rulings on BWI's motions, exceptions and motion for summary judgment;
2. in not granting and enforcing the exception of res judicata and allowing evidence in regard to alleged misconduct and "conspiracies" involving defendants and allowing irrelevant and improper evidence in connection with these matters;
3. in not granting and enforcing motion to exclude U.S. Product Safety Commission documents and allowing admission of these documents into evidence;
4. allowing improper expert testimony by Dr. Grimaldi, Larry Talley, Dr. Want, Dr. Broughton and Dr. Dryo;
5. in not granting motion to exclude parol evidence regarding BWI's contractual relationship to other defendants;
6. in denying motion to exclude apparent agency evidence;
7. in allowing evidence of alleged post-accident remedial measures;
8. in allowing plaintiffs' experts to testify about matters not disclosed in their reports *1205 or answers to interrogatories, and in not allowing BWI to depose plaintiffs' experts;
9. in allowing expert evidence concerning BWI's alleged legal duties;
10. in unduly restricting BWI's opening statement;
11. in allowing plaintiffs to use certain demonstrative evidence;
12. in allowing plaintiffs' evidence and argument regarding "corporate safety;"
13. in allowing Drs. Harper and Appel to testify as experts;
14. in failing to grant BWI's motion for directed verdict;
15. in denying certain physical and mental examinations and testing of plaintiffs;
16. in allowing plaintiffs to engage in certain non-verbal communication with the jury;
17. in allowing admission of certain plaintiffs' exhibits;
18. in ruling on certain evidentiary objections;
19. in allowing Ellis Piscotta's testimony;
20. in allowing Talley and Grimaldi to testify in corporate safety, quality assurance, marketing and safeguarding corporate logo, safety engineer in safety management and in all aspects of safety management in the hospitality industry;
21. in allowing plaintiffs' rebuttal witnesses and exhibits;
22. in excluding defendant's charts and videos and the testimony of Dr. Frederick J. Brown;
23. in giving and failing to give certain jury instruction per BWI's objections thereto;
24. in ruling on certain legal issues involving vicarious liability, the Lanham Act, strict liability, joint venture, legal duties owed by BWI under La. C.C. art. 2315, including corporate safety issues.
Finding no reversible error in the jury's verdict and the judgment rendered thereon, we affirm.

STANDARD OF REVIEW
In reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), p. 4, 666 So.2d 612, 614; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978);
The Louisiana Supreme Court set forth the standard of review of the verdict of a properly instructed jury:
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.... [A]ppellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.... When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.... [Where] a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
We are instructed that before a fact-finder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart v. State through Dept. of Transp. and Development, supra. Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts[4], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict *1206 was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman's Fund Ins. Co., 650 So.2d at 745.
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).

STATEMENT OF FACTS
Williamson's expert biomedical engineer, Dr. Joseph Dyro, testified that he holds an undergraduate degree, bachelor of science in electrical engineering, and Master's and Doctoral degrees in biomedical electronics engineering.[5] He testified that he is not a medical doctor, holds no medical degree and is not a licensed engineer. He has neither designed nor installed light fixtures or electrical wiring. He testified, based on review of the depositions of Robert and Sonya, examining physicians, photographs taken by Dr. Eugene Tims of water at the motel and material from the United States Product Safety Commission, that water pooled on the second floor of the motel and seeped into Room 170. The water came into contact with the light socket, completing a circuit between the hot wires and the surrounding conduit and lamp, which Sonya touched with tragic consequences. According to Dr. Dyro, rust on the junction box above the light fixture prevented the ground wires from safely carrying away the electrical overload, and there was no ground leading from the lamp up to the junction box. Because Sonya had just showered and was at least damp, her skin resistance was lowered, thus multiplying exponentially the effect when she touched the lamp. Dr. Dyro did not believe that the water damage evident immediately after the incident was caused by someone using a bucket of water to pour water through the ceiling.
Dr. Frederick Brown was accepted as an expert in electrical, mechanical and biomechanical engineering. He also took medical school courses in human physiology and anatomy, and has read literature on electrical injuries. He testified that he examined the wiring at the motel, five unrenovated rooms and in Room 170, and the lamps tendered by plaintiff and defendant. He consulted with Mr. Evans, an electrical inspector for the City of Alexandria, who confirmed Brown's findings that there were no electrical code violations at the motel. Brown testified that he was impressed by the workmanship evident in the wiring job at the motel. He found no wiring defect that could have caused Sonya's electrocution, and found that the lamp was properly grounded.[6] He demonstrated with a drawing of the lamp configuration, consisting of a suspension wire and hanging chain and plastic socket, that there was no way for water pooling in the ceiling to accumulate to make contact with any exposed wire. He testified that the electricity could not get to the suspension chain, even if somehow the electricity passed between the two sets of wires, but would blow a fuse (or trip a circuit breaker). Since the chain cannot be energized, there is simply no way that the lamp shade or the metal bracket or anything *1207 else that Sonya might claim to have touched could become electrically charged. He examined the lamps provided by both plaintiffs and defendant, and found that each had a ridged design so that if water could get into the lamp, it would be separated from the hot and cold wire and also would run through and come out of the bottom. Electrocution could be possible only if the light bulb and socket were totally submerged, for example, in a bathtub, but dripping water could not cause the same effect. Brown testified that he performed a test with himself as a guinea pig, with water running through a lamp fixture; he himself touched each part, chain, socket and bulb, with his hands and feet wet and the lamp assembly drenched and soaked, and there was no voltage on the chain, socket or bulb. On cross-examination, in response to plaintiffs' counsel's question, he said that in the course of this test, he drenched himself with water, took his shoes off and stood on concrete in a quarter inch of water and touched all parts of the lamp and did not feel anything because no path was provided for the electricity. According to Brown, manufacturers are aware of the fact that water can come down through ceilings, and have designed the lamps so that any water that does come down is led away from the contacts.
Brown also examined Room 270, directly above the Williamsons' room. He found no indication that air-conditioning water from Room 270 would be able to get to the light fixture in Room 170; specifically, the depositions he reviewed established without contradiction that shortly after the incident, the carpet in Room 270 was not wet. The carpet was removed and there were no cracks in the concrete slab between Room 270 and Room 170, and any water that could drip from 270 to 170 would have to come from the window air conditioning unit, jump across an air space in between the brick and the inside wall, and run along the ceiling to get to the lamp. Because of gravity, water goes down. The photograph shows wetness only around the lamp, and no wetness tracking from the wall. Brown testified that he taught fluid mechanics for 15 years and never heard of a situation in which water migrated[7] in significant amounts across a horizontal piece of steel the distance from the Room 270 air conditioner to the Room 170 light fixture.
Brown also testified that the accumulation of rust noted on the escutcheon plate of one of the lamps did not indicate an accumulation of leaked water. In his opinion, a dry, cold room, such as in a motel, in a humid climate like Louisiana's will experience significant condensation of hot humid air on the room's glass and metal components each time the door is opened. Because of this, he would expect an escutcheon plate that was in service for five or six years to have some rust. The testimony of Peter Murphy, the motel's maintenance supervisor, confirmed this opinion from Murphy's own experience maintaining motel rooms in Louisiana. If in fact there had been dripping water, then the junction box would have shown as much rust as the escutcheon plate, which was not the case. Brown concluded, based on his investigation and tests, that Sonya did not receive an electrical shock in Room 170. He also concluded, based on the manner in which electricity passes through the body, that if a person were to touch a live wire in the way Sonya claims she touched the lamp, the electricity would pass through the arm, down the body, through the leg to the floor, and would not pass through the brain. Dr. Frances Dyro, however, opined that if Sonya had touched a live wire with both her hands, the current could have passed between her arms, affecting her upper spine and brain stem.
Brown contradicted Dr. Joseph Dyro's opinion that the wall socket in Room 170 was improperly wired, or cross-switched. According to Brown, Dyro could not have determined from a flash photo, which was the basis for Dyro's testimony, which holes the *1208 wires went into, nor could he have determined whether the screws were gold or silver; these facts are necessary to support a conclusion of correct or faulty wiring. Brown agreed with Dr. Adams' conclusion of correct wiring, which was based on a woodhead test. Brown identified a burned wire contended by plaintiff to represent a "short" as a burn caused from outside the system, probably by application of a match or cigarette lighter to the outside insulation of the wire. The wire appeared to have been tampered with by someone who did not leave the heat source on the wire for a sufficient length of time to burn through to the wire.
Dr. Tims disagreed with Dr. Brown's opinion that the design of the socket precluded sufficient current travelling to Sonya to electrocute her. According to Dr. Tims, the water that leaked down the chain and wire to the socket provided a bridge across the insulated properties of the socket, whether plastic or ceramic, and got into the socket. It proceeded through the holes in the socket through which electrical contact is made between the wires and the contacts that the bulb must make contact with in the socket. Current could then flow from either one of the contacts in the socket to provide voltage that could have contacted Sonya if she touched the outside of the socket. The jury accepted Dr. Brown's analysis and rejected that of Dr. Tims.
The motel records, corroborated by Robert's testimony, reflect that the Williamsons requested to be moved from room to room at the motel for about a month prior to their having settled in Room 170 on 9 July 1989. Peter Murphy testified that Room 170 was the only room of the ones inhabited by the Williamsons that had a crawl space in the ceiling that was accessible to room guests. For at least two days preceding the alleged accident, the Williamsons did not allow any of the motel staff into the room for any reason whatsoever, including to change linen.
Although there had been no report of a leak in the ceiling prior to the incident, and no report of a leak after the incident, two motel employees testified they saw a fresh wet spot on the ceiling just following the incident, and a friend of Sonya's testified that water was dripping from the ceiling the afternoon of the incident. None of the several occupants prior to or after the Williamsons complained of a leak. Five motel employees testified that the leak occurred only when the Williamsons were in the room. Plaintiffs' witness, William Silver, who identified himself as a friend of the Williamsons, testified that he was in Room 170 with the Williamsons the night before the electrocution incident for about an hour, and he did not see any water leaking in the room, and did not notice anything wrong with the lamp. The afternoon of the incident, following the alleged electrocution, Silver went back to the room and noticed a white ring on the ceiling and water leaking down the lamp's white cord.
John Molette, a former Best Western maintenance man, testified that condensation from second floor air conditioners pooled in the second floor breezeway, forming puddles. He said that the water would on occasion leak to the floor below, into the threshold by the exterior door, onto the first floor carpet. According to Molette, who was called by plaintiffs, he had never seen water leaking down a lamp fixture.
Mark Thiels, a Best Western maintenance man called by plaintiffs, testified that while he had noticed air conditioner-based condensation along the breezeways at the motel, he had seen no leaks into the ceilings of first floor rooms prior to the incident, and no leaks into the ceilings of first floor rooms after the incident. Immediately after the accident, on that afternoon, he saw a trash can containing water underneath the light fixture in Room 170.
Peter Murphy confirmed that the only time water leaked down from an upstairs air conditioner, the leak was into an exterior window sill. He explained that the air conditioning unit goes through the wall and slips into a metal can; condensation drips to the outside. The unit that leaked started dripping back on the edge. Between the brick and studs, in the wall, is a one-inch airspace; beyond the studs toward the interior is sealer board, made of fiberboard. Murphy testified that the water dripped into the airspace between the brick and the studs and onto the *1209 top of the lower floor room's exterior window sill. Based on Murphy's ongoing review of the motel's construction plans, he testified that for water to migrate from Room 270's air conditioner to Room 170's interior ceiling lamp, it would have to go through the brick masonry, leap across the one-inch air passage (which is impossible for water not under pressure), through the studs, barrier board and floor plates, and migrate three to four feet across the ceiling. This he did not believe to be possible. Dixie Williamson testified that she never saw water leaking through the light fixture before Sonya's alleged accident. No leaks were reported after the incident. The maintenance man checked and verified there was no water leaking from Room 270 to Room 170. Murphy testified that the air-conditioner condensation formed during periods of high humidity on the sidewalks outside the guest rooms, but the water did not form a flood, and he knew of no complaints that people slipped or fell in the condensation. The second floor sidewalks were pressure washed regularly, without causing water to leak into rooms on the first floor.
The Williamsons told their doctor the water had been running through the lamp since the night before the incident, but they had not reported it to the motel, even though, according to Robert, it was filling a bucket every 20 minutes the day of the incident and the Williamsons had refused to allow housekeeping into their room. At trial, Robert denied having noticed, reported or told his doctor that the water had leaked overnight into his room, and denied having refused entry to housekeeping personnel. The jury apparently accepted the doctor's testimony and rejected Robert's.
The Williamsons did not present any evidence to explain why they did not call the motel maintenance or housekeeping to report this mini-Niagara, or why Sonya would try to turn on or change a light bulb in a lamp through which water was running, particularly when she was damp from a shower herself. This is particularly telling, since Sonya was well aware, from her own previous electrocution (Electrocution I) in 1982 and from her mother-in-law's electrocution 21 months earlier (Electrocution II) of the disastrous consequences of household electrocutions. This provides additional foundation for the admissibility of evidence concerning Electrocution I and Electrocution II, since that evidence would have weight in determining the issue of Sonya's degree of fault in Electrocution III, and is relevant to the issue of whether the incident occurred in the manner suggested by plaintiffs.
Plaintiffs introduced photographs allegedly taken by Dr. Tims during plaintiffs' pre-trial inspection of the premises, of water pooling on the second floor breezeway above the entrance to Room 170. The photographs were taken on a Saturday morning in July, 1994. Both Chief Housekeeper Dubois and Murphy testified that the breezeway was completely dry at 8:00 that morning, and that the air conditioning unit for Room 270 was turned off. Therefore, no condensation could have taken place. Neither Dubois nor Murphy could offer any source for the water photographed by Dr. Tims, since it was not present shortly before the inspection, and could not have been caused by condensation from the air conditioning unit. Both Dubois and Murphy testified that Robert was present at the inspection, but they did not observe him the entire time he was on the premises. Murphy testified:
We were in that room, and there was a knock at the door and I opened the door. And that's when Mr. Williamson was there. But I stayed with Dr. Tims and Dr. Brown while they were doing their examinations and their checks, whatever they were doing. I was with them the whole time.
Dubois testified that no repairs were made to either Room 170 or 270 after the incident, that no leak was subsequently reported, and the lamp was examined and put back up. Peter Murphy confirmed that testimony. Ellis Pisciotta, who represented Best Western's insurer, examined the lamp alleged to have caused Sonya's electrocution. Peter Murphy took down the lamp for the examination and returned it to its former place in Room 170 when the examination showed no defect in the lamp.
Three days after the incident, Dubois saw Sonya walking with her children to the van, *1210 and Sonya said she was fine, got into the van and drove away. Abner and Dixie Williamson testified that their mother never drove following the incident. A week and a half later, Dubois saw Sonya and the children watching TV in the motel lobby, and Sonya did not appear to be injured. Later that week, she saw Sonya and Robert walking together in the motel hallway. During the Williamsons' stay at the Best Western, Mrs. Dubois saw them driving a white Chevrolet van, a Chevrolet truck, a Chevrolet pickup truck with roll bars and a Cadillac.
Marlin Johnson, Sonya's brother, testified that Robert called him on 13 August 1989, and, at the end of a general conversation about the children and school, said, "Oh, by the way, Sonya has been electrocuted." Marlin went to the Holiday Inn in Alexandria where he found Sonya, her face flushed and swollen. She did not speak to him that night. Robert assured him that Sonya was getting better, and that he had called Marlin only because Sonya had been screaming for Marlin. Later, Robert took him to Room 170 at the Best Western, showing him the wall, the dampness, and the air conditioner.[8] Marlin did not see water leaking through the light fixture. Marlin insisted that Robert take Sonya to the hospital. Marlin called his sisters and mother, and the family gathered the following morning and went back to see Sonya. Sonya's family, when they saw her appearance, asked Robert to take her to the hospital. Robert excused his failure to take Sonya to the hospital by alleging that he was waiting for approval from Best Western's insurance company.
Marlin testified that when he arrived at the motel on 13 August to see Sonya, she was paralyzed and unable to speak, but, as time passed, she became more alert, sat up in bed, and her speech became less and less slurred. The last thing Sonya told her mother was that she would come to see her "when this was all over." As Sonya and her sister were speaking, Arlone Belaire, Sonya's mother-in-law, became very agitated, screamed and ran into the bathroom. Robert came out of the bathroom and demanded that Sonya's family leave the room. As Marlin was leaving, he saw Robert open a white package and put some powder into Sonya's drink. Sonya's family remained outside for thirty to forty-five minutes, and when they returned to the room, Sonya was again paralyzed, she was slouched back down in the bed, her eyes were not focused, and her speech was so slurred she could not communicate with her family.
Marlin and his sister, Linda, went to the Best Western and called its insurance representative, Mr. Pisciotta. When Pisciotta was non-committal, Linda returned to the Williamsons' room at the Holiday Inn and offered to pay for Sonya to enter a treatment center. A Best Western representative came to the Williamsons' room, and asked Marlin to return to speak further with Mr. Pisciotta, and as a result of their conversation, Marlin told Robert that the insurance company would pay for Sonya's treatment in the hospital. Robert refused to admit her without Dr. Lindsay's permission, which was later obtained.
Following this incident, Marlin sought out Dr. Lindsay, without success. Marlin returned, met Robert in the parking lot and begged him, on his knees in the lot, to take Sonya to the hospital for treatment. Marlin sought advice from the District Attorney's office and the Coroner. Marlin later learned that Robert had appeared in the Rapides General Hospital's emergency room, and, along with Marlin's minister, met Robert in the hospital's parking lot. Robert used foul, profane language, and knocked the minister's glasses off, but did not explain the nature of his anger. Marlin went to the emergency room where he subsequently observed Dr. Lindsay's examination of Sonya. As the family was leaving, Marlin heard Sonya tell their mother not to worry, that Sonya would come to see her "when all of this was over."
Sonya's family petitioned the Coroner and the District Attorney to attempt to have Sonya seen and treated involuntarily, whereupon Robert took her to the Rapides Parish ER. At that point, Robert told Sonya's family not to attempt to contact him or Sonya again. Marlin has seen Sonya twice since *1211 August, 1989 and her sister was not allowed in the house to see Sonya.
Linda Sipco, Sonya's sister, testified that on 29 July, eight days after the incident, Sonya telephoned her and spoke clearly to her. During the course of that conversation, Linda detected nothing abnormal, and Sonya did not mention the electrocution incident. Sipco corroborated Marlin's testimony concerning the events of 14 August 1989.
She testified that when Sonya was released from the emergency room, about 5:00 p.m., she met Robert in the Holiday Inn parking lot and gave him money so that the Williamsons could return to the Holiday Inn. She promised to help with the children if Sonya was hospitalized. When Sipco returned the next morning, the Williamsons were gone. The Johnsons attempted to locate Sonya and in Fall, 1989, learned they had moved to Lafayette. Sipco drove by to visit, and on 1 January 1990, she and her mother drove to Lafayette to bring the family Christmas presents. Sipco called ahead, and Robert told her to wait about twenty-five minutes; when they arrived at the Williamson home, Sonya was incoherent. Sipco does not know where the Williamsons are now living, and has not visited them since 1991. In 1990, Robert severed contact between his family and Sonya's family. Robert has threatened Sipco should she try to call or visit Sonya.[9]
Sonya and Robert claim she awoke the day after the incident unable to walk or to talk. Robert claims she has not driven a car since the incident. Sonya claims since that day she had been incoherent, incontinent of bowel and bladder, unable to move her right side, and has suffered with a right dilated pupil, right facial palsy and drooling.
However, the jury could have believed the following contradictory testimony:
The motel's housekeeping manager, Ms. McNeal testified that Sonya was sitting in the lobby watching television the day after the incident;
Barbara Dubois, the motel manager, saw Sonya go to the Williamsons's van in the motel parking lot two days after the incident with the Williamson children; Dubois asked Sonya how she felt, and Sonya said she was fine and drove the van off the lot;
McNeal saw Sonya driving her van two days after the incident; Sonya parked the van, got out without assistance, and told McNeal hello;
Dubois saw Sonya 4 to 5 days after the incident in the lobby watching television with Robert and the children;
The motel maintenance supervisor saw Sonya walking around the motel several days after the incident;
Dubois and another employee saw Sonya walking and leaning on Robert about a week after the incident;
Eight days after the incident, Sonya spoke to her sister and did not mention the incident, said she was doing fine and engaged in normal conversation;
Sonya was seen by Susan Gill Johnson at a fashion show several weeks after the incident, on 3 August 1989, not in a wheelchair and appearing normal.[10]

THE MEDICAL TESTIMONY CONCERNING THE SEQUELAE OF THE ALLEGED ELECTROCUTION
Robert claims he administered CPR to Sonya when he found her, allegedly unconscious and not breathing, and did not call for emergency medical assistance. Upon the insistence of the motel's manager, Robert took Sonya to the Rapides General Hospital emergency room. The ER doctor found no marks or burns on Sonya's skin to show electricity had entered her body. All ER tests were normal. In the emergency room, Sonya was found to have a concussion and a dilated right pupil.[11] She was released.
*1212 Specifically, according to Dr. Leo de Alvare, the tests performed in the ER referred to as SGPT, SGOT and LDH showed that Sonya did not have any period of cardiac arrest on the day of the alleged shock. Dr. Martinez agreed that Sonya's heart did not stop. The tests examine muscle and liver enzymes. The LDH test is particularly sensitive in determining heart stoppage, and this test was normal. The SGPT and SGOT test for muscle enzymes; patients who have sustained electrical shock have brisk muscle contractions which give off large quantities of the enzyme, but both these tests showed no rise in Sonya's muscle enzymes. Dr. Martinez agreed that the enzyme tests were normal. In spite of this evidence, Antoinette Appel, plaintiffs' neuropsychologist, testified that she believed Sonya suffered anoxia and hypoxia for between three and six minutes as a result of electric shock. Apparently, the jury accepted the former analysis and rejected Appel's opinion. Appel also opined that Sonya suffered increased intracranial pressure as a result of the incident, but this testimony was not corroborated by any other witness, including plaintiffs' own experts, and was apparently rejected by the jury.
On 27 July Sonya saw Dr. Philip Lindsay, on referral from the ER doctor, presenting with slurred speech, right-sided facial and tongue weakness, and a dilated right pupil. She was able to walk at that time. His initial diagnosis, based on the history given by Robert and Sonya, was electrical insult to the brain. He found no signs of intracranial pressure. Dr. Lindsay admitted that in making his diagnosis, he assumed that Sonya had a respiratory/cardiac arrest and a hypoxic CVA brain stem injury because of the facts related to him by Robert and Sonya, although even plaintiffs' physician, Dr. Martinez, denied that Sonya suffered cardiac arrest and resulting anoxia. The Williamsons did not disclose to Dr. Lindsay either Electrocution I or the tractor incident, or the fact that Sonya had suffered a concussion less than a month prior to Electrocution III. He admitted that he could have been tricked by Sonya, but believed her dilated pupil was real. He was unaware that Sonya's dilated pupil symptom has sometimes appeared in the right eye and sometimes in the left eye. He also admitted that rubbing scopolamine on the eye could cause pupil dilation. He testified that reflexes could not be faked, and that Sonya's reflexes were normal. On 14 August Dr. Lindsay saw her again in the ER, and noticed no major change in her condition. He advised Sonya's family that her needs were being met by her family and he did not recommend hospitalization. He referred her to Dr. William A. Martin in New Orleans for neurological evaluation and treatment.
On 31 July 1989 she saw her family physician, Dr. Ardley Hebert. She had a dilated right pupil (although both pupils reacted to light and accommodation), and right-hand flexion, she was walking while leaning on Robert, and had a marked speech defect.[12] He examined her for evidence of electric burns and found none. A month later, her right pupil was still dilated and she had more right side weakness. Over the next four years, she got worse, and her condition leveled off. Dr. Hebert believed she had electrical shock which damaged her brain.[13] He testified that he was not her treating physician, that he had no expertise in this sort of injury, but was seeing her for "moral support," and that her treating physician was Dr. Robert D. Martinez, but, when cross-examined, *1213 said he felt he was a part of her team of treating physicians. He was surprised to learn that Sonya had seen only Dr. Martinez, and then not until 1990, for treatment. In August, 1992, Dr. Hebert prescribed Tylenol for Sonya's headaches and two mg. of Valium three times a day for nervousness.
Dr. Martin, a New Orleans neurologist, testified by deposition that prior to performing and reviewing the results of diagnostic tests, he believed Sonya had sustained a brain injury; after Sonya submitted to testing, Dr. Martin no longer believed she had sustained any brain injury from this incident. Dr. de Alvare reviewed Dr. Martin's records and deposition and testified that because of the lack of objective evidence of any cerebral process going on, Dr. Martin did not think Sonya had an organic brain injury of any kind, a conclusion with which Dr. de Alvare agreed following his own examination of Sonya.
Shortly before the case was first set for trial in October, 1992, Dr. Martinez informed the Williamsons' prior counsel, Jack Martzell, that he suspected that the Williamsons' claim was fraudulent. Mr. Martzell ultimately withdrew on the morning trial was to begin, based on ethical grounds.
From February, 1990 through 1994, Sonya saw board-certified neurologist Dr. Robert Martinez, who was accepted as an expert in neuro-rehabilitation and neurology. He believed Sonya had brain stem damage related to the 1989 electric shock. He also believed she was not faking her spasms. He had some doubts when Robert did not seem pleased with Sonya's normal MRI results and was troubled that Robert tried to remove the films. Despite this concern about Robert, the doctor continued to rely for about 80% of his opinion on the history Robert gave him. His diagnosis upon discharge was diffuse encephalopathy, spastic quadriparesis with cognitive dysfunction, that, absent any other explanation, was a sequela to her exposure to electrical injury; however, his relation of the injury to the electrical incident was based solely on the history given to him by the Williamsons. Dr. Martinez testified that he did not consider himself to be Sonya's treating physician; had he known that Dr. Hebert considered him to be her treating neurologist, he would have had Sonya come to his office every six to twelve months for follow-up treatment. He did not coordinate his findings with Dr. Appel, Dr. Wand, Dr. Dyro, or Dr. Broughton. In his opinion, Sonya's EEGs and CAT scans are normal, and the MRIs done through 1992 are normal. He would expect that someone exhibiting the kind of problems Sonya was exhibiting would have had abnormal test results. He would also expect Sonya's tests to have been positive for cardio-pulmonary arrest had she actually been rendered unconscious and had her heart and breathing stopped following the incident at the motel. He noted that disagreement exists even among the physicians who interpreted the most recent tests as showing abnormalities as to just what abnormalities exist. He testified that it was more likely than not that the abnormality to which Dr. Steinberg testified in the 1993 test (which Dr. Martinez did not think was an abnormality) was caused by disease or injury occurring after the 1992 MRI was taken, or by ingestion of neuroleptic drugs or by psychiatric condition. Dr. Martinez testified that it was his belief, based on history supplied by the Williamsons, that the incident in the Best Western motel was Sonya's third, not second, electrocution, and that she had been electrocuted for the first time when she was ten years old. He was not advised of the tractor incident. He testified that there was no hard evidence from the diagnostic studies that there is anything wrong with Sonya. When asked on cross-examination whether even doctors could be fooled by patients who are malingering, he replied, "Everyone can be fooled.... Even doctors. Life is a stage."
A 1992 brain scan (SPECT scan) by Dr. Kobanallur Subramanian revealed reduced blood flow to the cortex and basal ganglion. A second scan in 1993 showed some improvement in the cortex, but not in the ganglion. Dr. Subramanian testified that as far as he was aware, no medical article has been published that has correlated electrical shock with brain SPECT studies. Dr. Donald Samuel Adams, a medical neurologist specializing *1214 in strokes, seizures, brain injuries and back and neck pain, opined that this evidence could have been caused by ingestion of major tranquilizers, such as the Etrafon that Dr. Aretta Rathmell testified Sonya had taken. Dr. Adams testified that any medical dictionary makes clear that neuroleptics cause neurologic symptoms, and toxicity from neuroleptics can cause the type of picture to which Dr. Subramian testified.
Plaintiffs' neurologist, Dr. Frances Dyro, testified that depression and the use of neuroleptic medications was a likely cause of Sonya's symptoms following both Electrocution I and the tractor incident, but denied that her present symptoms are drug-induced or psychiatric. She admitted that the basis for her assumptions that Sonya had suffered convulsions at the time of the incident was the history given her by Robert.
Dr. Frances Dyro testified that she had not examined Sonya. She believed that Sonya's dilated pupil indicated a brain stem problem. She believed the onset of Sonya' symptoms could have been delayed, citing a delayed reaction case she had handled 19 years ago. She admitted that the victim in that case was much more seriously injured when he was electrocuted by a high energy power line while operating a "cherry picker" crane. That victim, unlike Sonya, suffered cardiac arrest (had an EEG that was post-anoxic) and was comatose for several days after having been resuscitated. This does not explain, however, plaintiffs' claim that Sonya's symptoms were evident the day after the incident although several witnesses testified that they saw her walking, watching television and driving during the period from two to about ten days after the incident. Dr. Dyro also testified that she had never seen anyone injured by household electrical accident as severely as Sonya.
On cross-examination, she denied that a normal EEG would 99 times out of 100 rule out brain trauma. She was presented with her deposition in an unrelated case where the issue was whether a person, also represented by plaintiffs' counsel had had a brain injury from a prior auto accident or had sustained an unwitnessed injury in the hospital. In that deposition, she testified that a normal EEG "... 99 out of 100 times ... rules out brain trauma." She also admitted on cross-examination that drugs affecting the basal ganglia might not show up on an MRI, but might create a positive SPECT scan or PAT scan.
Appel opined that Sonya had injury to the mid-brain and brain stem with major cognitive impairment due to household electrical current shock. Appel did not believe Sonya was faking, although she admitted she had performed no tests to establish malingering. Appel admitted she gained most of her information from Robert, and only "interviewed" Sonya once. She did not meet with Dr. Hebert or Dr. Martinez, and met Dr. Lindsay only briefly in the courtroom prior to her testimony. She admitted she had not read the deposition of Sonya's treating physician in arriving at her opinions. She disagreed with Dr. Martin's opinion, after his review of the MRIs, that Sonya is not suffering from a neurological injury that can be associated with an electrical shock event. It appears that the jury chose to believe Dr. Martin rather than Appel.
Several issues concerning Dr. Appel's background could have further influenced the jury's evaluation of her credibility. Dr. Appel had claimed to be the first Ph.D. in neuropsychology in the United States, but retracted the claim when presented with written contradiction from her University. She admitted that she holds no medical degree and no medical license. She claimed to be a member and diplomate of the American Board of Professional Neuropsychologists, but the Board denied she was an active member. She claimed to have performed classified work and to have gained much of her expertise with the National Aeronautics and Space Administration (NASA), but later admitted she was at NASA for only one month while attending a "space camp" in 1968. NASA provided a letter saying that a person completing that one class at NASA could not be considered an expert in any NASA discipline.
Dr. Paul Wand, a neurologist specializing *1215 in brain mapping,[14] a computerized version of the EEG, testified that he saw Sonya on 13 September 1993. He opined that, based on his brain mapping test and the history provided by Robert and, to a much lesser degree, by Sonya, plaintiff was brain damaged by electrical shock. He had been told of the 1982 electrocution and the Arlington auto accident; however, he had not been advised that Sonya saw Dr. Guillory or any other doctor after the Arlington accident, nor had he been advised of her TMJ diagnosis arising out of that injury. Dr. Wand did not perform a blood screening test for drugs prior to the brain mapping test. His physical examination of Sonya revealed a positive Babinski[15] test on the right foot, showing neurological damage. He testified that the positive findings on the brain mapping test were corroborated by the Magnetic Resonance Angiography (MRA) which showed partially occluded blood vessels on the left side of Sonya's brain, but admitted that the findings could be affected by drug toxicity. He also testified that the fusion-profusion test he performed on Sonya was normal, as were tests of the cortex, including parietal lobes. Like the other doctors who testified, Dr. Wand had never seen a patient injured from an electrical incident with the symptoms presented by Sonya.
Dr. Fred Steinberg testified that he had special training in the use of the MRA technique[16]. He analyzed the various MRIs and found lack of blood flow due to potential organic injury to the thalamus and left thalamus and the left internal capsule on the 1991 MRI, and fainter evidence of abnormality in the 1992 MRI. He found more distinct abnormality in the medulla on the 1993 MRI. These same MRIs were found to be normal by other doctors. Dr. Steinberg reviewed Sonya's MRA test results, and found a discrepancy between the left side and right side arteries, showing a slower velocity of blood flow in the left side compared to the right side. Dr. Steinberg testified that he has never treated an electrical injury, and, not having reviewed Sonya's clinical records, he could not relate the findings directly to her clinical picture. According to Dr. Steinberg, this is the proper work of her neurologists. Dr. Steinberg reviewed Sonya's CAT scans and found them to be normal. He also admitted that the abnormalities in the 1993 MRI to which he testified could have been drug-induced or caused by a subsequent injury or disease process. Dr. Steinberg admitted that although the lesions he identified in the MRI would affect her walking, they would not be likely to cause a complete inability to walk, incontinence of bowel and bladder, lack of memory or inability to talk. Dr. Steinberg testified that the profusion study showing the cortical areas of Sonya's brain was normal, as was the MRI of her cervical spine. He found no abnormalities in the cerebellum, motor cortex, visual cortex, or auditory cortex and found no evidence of stroke.
Dr. Edward L. Soll, a radiologist in practice with Diagnostic Imaging Services, testified that he reviewed Sonya's MRI and MRA magnetic resonance angiography film studies of the brain and Dr. Steinberg's deposition. *1216 He testified that the MRI was normal, and the MRA revealed no obvious abnormalities. Dr. Soll opined that Dr. Steinberg's finding of abnormality could have been caused by the way in which Sonya was positioned, or held her head and shoulders during the test, and recommended a subsequent test with proper positioning. It appears from the verdict that the jury chose to accept Dr. Soll's view of the evidence rather than Dr. Steinberg's opinion.
Neurologist Dr. Adams reviewed Sonya's records and supports Dr. Soll's opinion. He testified that although Sonya appears to be devastated, all of the imaging studies are normal, as are her EEGs. According to Dr. Adams, "That is simply not possible." In his opinion,
[T]here is very good evidence that this cannot have a physical basis related to an electrical shock. The SPECT scans are abnormal which have other implications.... [O]nce we have eliminated the physical aspect of this then there are other possibilities, drug toxicity, malingering, faking if you want to call it that, or some of the others.
He testified that the abnormal SPECT scans could have been caused by major tranquilizers, which work by blocking dopamine transmissions in the basal ganglia in the brain, thus controlling psychotic symptoms. Those drugs also cause changes in flow to the basal ganglia on SPECT scans.
Psychiatrist Richard Roniger, M.D. examined Sonya in Robert's presence on 12 August 1992. He also reviewed her videotapes and medical records provided by Robert. He concluded that he was unable to explain Sonya's condition on a psychiatric basis; she presented with no known clinical psychiatric syndrome and, based on his review of the records, he is of the opinion that she does not have an organic brain injury. He concluded from his examination of Robert and of Robert's medical records that Robert has a history of bizarre behaviors and presentations which have been difficult to explain. He concluded that Sonya does not have a psychiatric disorder, nor is she suffering organic brain injury secondary to shock. It was Dr. Roniger's opinion that Sonya's symptoms resulted from malingering, faking, or toxicity from neuroleptic drugs such as Etrafon and Trilafon. The side effects of these drugs can remain after the drugs themselves would no longer show up on a drug screening.
Dr. Donald Harper, a Lafayette neurologist, was accepted as an expert in neurology and pharmacology. Dr. Harper testified that since his board certification, he had seen two patients who complained of organic brain injury following electrical shock. He independently examined Sonya on 9 May 1990 for the disability insurer in connection with an automobile disability policy claim. Dr. Harper accepted Robert's history of Electrocution III, physical and occupational therapists' evaluations, Dr. Franklin's evaluation, and medical records from Dr. William Martin and Dr. Hebert. This was the only time he saw Sonya. He examined Sonya, but found the examination difficult to perform because of Sonya's restlessness. He found symptoms similar to a stroke. Harper testified that Sonya's symptoms were caused by anoxia, which, he was 95% certain, resulted from electricity's having passed through her brain stem. He had not been supplied any records concerning Electrocution I, but thought that incident would have made her more susceptible to electric shock injury. Dr. Harper admitted on cross-examination that the fact that she didn't have an external burn and that her muscle enzymes were normal support the conclusion that she did not have enough current flowing through to damage her tissue, and that would mean the injuries were caused by anoxia, or cardio-pulmonary arrest. On this patient, in her status quo ante condition, he would expect that one of Sonya's MRIs would have picked up such damage. He also testified that he was not aware that Dr. Martin is now of the opinion that based on the fact that all of Sonya's MRIs are normal, she does not have a neurological deficit that can be associated with the electrical shock event. He did not have all of Sonya's reports, only those the plaintiffs' counsel's office had forwarded to him. Specifically, he had not been given MRI reports rendered by any physicians other than Dr. Paul Wand, nor had he been given a copy of the CT scan reports or EEG *1217 reports, particularly the 24 hour EEG performed at Lafayette General Hospital; nor did he receive a copy of Dr. de Alvare's examination or Dr. Donald Adams's reports. Likewise, he received no reports in connection with the two quadriplegia-causing injuries of 1982 and their respective miraculous[17] recoveries, nor did he have access to the ER reports that found no evidence of anoxia or cardiac arrest.
Dr. Harper testified that he had never known anyone who suffered the electric shock and symptoms alleged by Sonya in 1982's Electrocution I who survived, and could not explain her first miraculous recovery. Likewise, he was unaware that Sonya developed the same symptom complex a month later in the tractor incident, from which she had the second miraculous recovery. He made no formal tests for malingering, such as tests for tubular vision or beefer signs.
Sonya was examined by Dr. Leo de Alvare, a Lafayette neurologist with sub-specialties in bio-electrical systems and electrical engineering. He saw Sonya three times, and performed two total clinical exams. On 17 September 1992, her pupils were not dilated, nothing was wrong with her eyes and the muscle tone in her neck was inconsistent with someone who held the neck position Sonya allegedly held all the time; he opined that she was purposely holding her head to one side. He testified that it appeared that Sonya tensed her muscles on the left side, in an attempt to confound his examination, and voluntarily held her arms rigidly to prevent his checking her reflexes. He was able to obtain her reflexes, which proved normal, by pretending to hit one side while hitting the other. He found no neurologic dysfunction. Despite Sonya's devastated appearance, he found no physical evidence of injury, and no change in muscle tone, although her muscles should have been weak and flabby had she spent years in a wheelchair. She demonstrated none of the skin changes associated with paralysis. He opined that the lack of burns at the time she presented in the ER following the incident indicates she did not receive high amperage shock. He found no evidence of incontinence.[18] When Dr. de Alvare saw Sonya on 8 September 1993, she demonstrated no slurring of speech; her left arm, which was normal at the first visit, was now constricted; the spastic hand that had been on her right side at the first visit was now on her left side, and she carried her right hand in a fist. Because her MRIs, CT-scans and EEGs were normal, he believed there was no brain injury such as would produce the symptoms she alleged. He opined it would be impossible to have her symptoms and yet produce four normal MRIs. Because of her Emergency Room normal liver and muscle enzyme tests, he concluded that her heart had not stopped beating on the day of the incident, and she sustained no brain damage.
Dr. de Alvare opined that there was no way Sonya could have sustained the electrical injury she alleged, and that either she was mentally ill or she was faking her symptoms. He gave his opinion, as a medical probability, that the most plausible explanation for Sonya's symptom complex is that she is a simulator, one who pretends to be sick for monetary gain. During his physical examination of Sonya, the doctor noticed that her signs would change as he moved from one part of her body to another. He testified that perhaps some of the physicians who examined Sonya had problems arriving at the correct conclusion because they were not receiving an accurate history from Robert.
Dr. de Alvare went through all the possible mechanisms whereby Sonya could have been injured, rejecting each based on his clinical findings and on the various tests. Sonya could not have sustained a thermal injury, because such an injury would have burnt her skin, conducting nerves and blood vessels, and muscles before it burnt her brain cells, and there was no evidence of any burn on Sonya. Sonya could not have sustained a vascular injury, which would have been analogous to a stroke. Strokes are readily visualized *1218 on CAT scans and MRIs; as Dr. de Alvare said, "A stroke is forever." Sonya's normal EEG, MRIs and CAT scans preclude a finding of significant vascular injury. Finally, Dr. de Alvare was able to rule out spinal cord injury, since her symptoms occur above the neck, in her face and with her speech. Her injuries are brain-associated, rather than spinal cord-associated. He concluded that there was no evidence of increased intracranial pressure: he had never heard of or seen a patient who was given hydrocephalus by electrical shock. Further, patients do not develop hydrocephalus or intracranial pressure and then have it go away without intervention by placement of a ventricular shunt. Sonya did not demonstrate the objective signs of hydrocephalus, which include papilledema (swelling of the eyes), inability to move the eyes upward, progressive difficulty with gait, or symmetrical bilateral signs.
Neurologist Dr. Donald Adams was also qualified as an expert in rehabilitation. He agreed with Dr. de Alvare that there was no possibility that Sonya suffered electrically-induced brain injury, that such injury is in the nature of a stroke, and there was no evidence of stroke on Sonya's four years of normal MRIs, one of which was run for 24 consecutive hours. He quoted medical literature that there are no reports of 110 volt current (household) causing brain injuries unless the heart and breathing have been stopped and the ER tests prove conclusively that this was not the casenot only the enzyme tests to which Dr. de Alvare testified, but also a normal EEG preclude a finding of heart stoppage. He testified it is absolutely impossible that the four years of MRIs would not pick up an organic brain injury.
Dr. Adams pointed out several inconsistencies with Sonya's condition. She seems to have improved over time, although brain damaged persons plateau after one year; she scored in the unimpaired range on mental status exam; her skin showed none of the breakdown that follows the truly wheelchair-bound or incontinent.
Dr. Adams testified that neuroleptic drug toxicity could cause Sonya's symptomology. Side effects of these drugs include stiffness, rigidity, stiff neck and motor control problems. Dr. Hebert had diagnosed Robert as schizophrenic, and prescribed Etrafon, a neuroleptic drug frequently given to schizophrenic patients to subdue bizarre behavior.
Dr. Rathmell testified that Robert told her Sonya had been prescribed and was taking Tofranil, an anti-depressant, Navane, a neuroleptic tranquilizer, and Cogentin, a drug given to people who are taking neuroleptic medication to counteract the side effects of tremors and stiffness. Dr. Adams testified that Cogentin was used for that purpose in the 1970s, but is now used only to a limited extent. According to Dr. Rathmell, these neuroleptic drugs cause sedation, sleepiness, muscle rigidity in the neck and eyes, Parkinson's symptoms, fixed, expressionless face, limb contraction and inability to relax muscles. The symptoms can subside when the medication is discontinued, although in rare cases the symptoms are irreversible.
Diane S. Mayer, M.D. was accepted as an expert in physical rehabilitation. She examined Sonya on 11 September 1989 for the purpose of having her admitted into a physical therapy program. She recommended that Sonya be hospitalized, and referred Robert to Dr. Franklin in Lafayette, where the Williamsons were living. She performed a Babinski test and a Hoffman test on each side of Sonya to determine evidence of brain damage from muscle tone indicators, but both tests were normal. Dr. Mayer's overall recommendation was that Sonya be admitted for in-patient or acute hospital care, so that she would have an attending physician, necessary consultants, and a full medical work-up, including a test to determine incontinence.
Sonya's and Robert's refusal to submit to long-term inpatient care is largely unexplained. Defendants suggest that Robert keeps Sonya paralyzed and unable to speak coherently by administering a narcotic drug. The defendants find support for this theory beginning directly after the incident, with Sonya's family's visit to the Williamsons' room in the Holiday Inn in August, 1989. In the years following the incident, the Williamsons have refused all inpatient care that *1219 would allow for long-term observation of Sonya by health-care providers who could determine conclusively if her symptoms were real, faked, or drug-induced. Dr. Robert D. Franklin, who is in the process of applying for board certification in rehabilitative medicine, examined Sonya and testified that he believes that, in her present condition, she would not benefit from a rehabilitative perspective, from inpatient, as distinguished from outpatient, care. Dr. Franklin saw Sonya only once, in November, 1989, and received her history from Robert, and from correspondence from her former treating physician, Dr. Martin. Dr. Franklin did not communicate with any of Sonya's doctors. He ran no tests on Sonya, and based his evaluation on Robert's history and on examining her in her wheelchair. He reviewed Sonya's physical therapy records from Our Lady of Lourdes rehabilitation center, which show that she had 7 visits in October, 1989, ten in November, 1989, three in December, 1989 and one in January, 1990. Her actual physical therapy concluded in January, 1990, just six months after the incident, when, according to the hospital record, Robert came in, "upset, requested discharge". She was discharged from physical therapy in March, 1990, when she was fitted for a wheelchair.
Peggy Meche, a speech therapist on the Board of the Louisiana Head Injury Foundation, a voluntary support group, who holds a license from the Speech and Hearing Association, testified for plaintiff concerning her speech and linguistic evaluation of Sonya at Our Lady of Lourdes. She saw Sonya for a total of 21 sessions of thirty to forty minutes' duration. Sonya was able to follow one-step commands, could speak imitatively, but could not write. The testing required three weeks. She testified that Robert was reluctant to leave Sonya alone with the therapists, and that the longest therapy session in which she took part was at most forty-five minutes. Sonya showed some insubstantial improvement under Meche's care, but she was discharged upon Robert's insistence on 11 January 1990. Because of the consistency of Sonya's performance at the severe to profound levels on diagnostic linguistic tests, Meche did not believe she was malingering. She testified that she would, however, defer to a neurologist or medical doctor for a medical opinion as to whether Sonya was faking or not, and she admitted that Sonya could have "faked her out," although she did not believe it was likely in Sonya's case. Meche testified, "She faked a lot of people out if she faked me out." Meche had not been informed of Electrocution I, the tractor incident or the two miraculous recoveries from quadriplegic symptoms in each of those cases, nor had she reviewed Sonya's prior depositions.
Dr. Jack d'Amico holds a bachelor's degree in professional speech pathology and general studies, a Master's degree in communication disorders and a Doctoral degree in linguistics. He examined Sonya on 10 September 1993 and reviewed two of her depositions to determine the existence of residual communication disorders or deficits, fifty months post onset, and to determine whether those impairments affect her ability to function and to think. Because Sonya presented herself in a wheelchair and claimed she had been electrocuted, he was looking for aphasia, dysarthria, apraxia of speech and evidence of traumatic brain injury. Because of her alleged paralysis, he expected to find aphasia due to a problem in the anterior portion of her brain; such a problem would also cause labored, telegraphic speech (elimination of connectives and articles). He used the Porch Index of Communicative Ability, a powerful and well researched test of aphasia or neurological impairments in speech language pathology, using verbal subtests since she claimed she could not use her hands to point.
Dr. d'Amico's examination revealed she had no arm or leg movement, and leaned to the right; she was expressionless and had a constant drain from her right nostril, both eyes were unfocused and both pupils were dilated. He saw no tremors or tics, or fasciculations (bulges underneath) of the tongue. During the course of the examination, Sonya became more responsive, and laughed spontaneously, with both sides of her face being involved. He found Sonya to have progressed favorably from the first to second deposition and from the second deposition to his examination. He observed inconsistencies in *1220 Sonya's performance during the course of his examination; both the degree of hypernasality (problems with resonance) and problems with articulation were marked at the beginning of the examination but had improved toward the end of the examination. This pattern is exactly the reverse of what he would expect, since normally a patient becomes more and more tired as the examination progresses, and the results deteriorate rather than improve.
The examination for aphasia included testing for her grammatical language construction. Sonya's grammar was correct 98% of the time, which is well within normal limits of the Southern White English dialect with which she grew up. This result clearly suggested she did not have aphasia.
Dr. d'Amico's functional analysis of Sonya's speech, particularly its structure, employed the Clinical Discourse Analysis, an assessment procedure he developed and which is widely used in the United States and the English-speaking nations. This analysis demonstrated that only 18% of her utterances exhibited any functional language difficulty, which was within normal limits. His test results in the foregoing conversational analysis examination were inconsistent with traumatic brain injury.
Dr. d'Amico testified that the Porch test uses a sophisticated scoring system which analyzes test results based on accuracy of responses, responsiveness, completeness of understanding, promptness and efficiency. Sonya did not do well on these tests, scoring on the first test in the 42nd percentile using aphasia norms, in the 46th percentile using brain damaged patient norms, in the 28th and 29th percentile on the naming test, in the 16th percentile on the sentence completion test and in the 18th percentile on the test identifying the use of given objects. Scores this low indicate that the patient is not a functional communicator, and suggest global aphasia. This is totally inconsistent with the scores of her conversational test. Sonya also showed an inconsistent result because she performed better on the harder tasks than on the easier ones. Dr. Porch's studies show that individuals who violate the pattern in this way indicate that the difficulty is non-organic, that is, not due to brain damage. Sonya responded well to "give and take" conversations, but did not perform the test tasks, a situation not seen with brain damage. Examples of these inconsistencies found in Sonya's videotaped depositions were played for the jury.
Dr. d'Amico concluded that there was only potential evidence of a mild, infrequently occurring problem forming speech sounds (dysarthria), and no evidence of neurological impairment based on his experience and what he knows of the literature on speech language pathology. Sonya's difficulties are puzzling, and unexplained by normal and expected neurological communicative deficits. His experience suggests that the primary explanation for much of her apparent communication difficulty is non-organic in nature. This non-organic cause could be drug toxicity or malingering.
Teresa Maize, a physical therapist who saw Sonya at Our Lady of Lourdes, testified to muscle exercises she performed with Sonya and which she taught Robert to do for Sonya at home. She last treated Sonya on 8 November 1989. Sonya appeared to be hurt when put through passive range of motions or when her joints were moved. According to Maize, when Sonya was placed on a tilt table at a 40 degree angle, Sonya's blood pressure and heart rate remained constant; this finding is inconsistent with the expected experience of true wheelchair patients, who normally demonstrate an elevated blood pressure and heart rate under these conditions. Nursing expert Mary Ann Darrah confirmed that conclusion. Maize testified that Sonya had not substantially improved by the time Robert had her discharged. Maize had not been informed of Sonya's prior electrocution and tractor injury, and of her two previously resolved quadriplegias. Maize had also recommended inpatient therapy, but Robert refused to allow this.
Significantly, Dr. de Alvare concluded from his review of the circumstances of Electrocution I and of Electrocution III, and of the recurrence of the serious quadriplegia symptoms following the tractor accident, that Robert's failure on each occasion to call paramedic assistance and the family's failure to *1221 submit Sonya to hospitalization are suspicious. Such a patient should be in the hospital for diagnostic tests then in-patient rehabilitation for six to eight weeks, and probably six months of out-patient rehabilitation, which Sonya did not receive. The Williamsons kept going to different doctors, and failed to take the doctors' advice or return for additional testing. He found further evidence of malingering in her trembling during her exams, her inconsistent and variable speech deficits. She lacked objective signs that only neurologists would know about such as the Chaddock and the Oppenheim, and yet tried to reproduce signs like the Babinski, which is common knowledge among people who have little medical sophistication. Sonya's leg measurements were identical, demonstrating none of the differential and muscle wasting that would normally be associated with the right-side weakness she claimed. The fact that her symptoms wax and wane is also suspicious. The test for aphasia supported his conclusion of malingering as well; Sonya consistently misidentified colors, rather than randomly misidentifying them, demonstrating that she was able to recognize the color and know what it was, and conscientiously said something else. The lack of any objective findings on the paraclinical examinations, MRIs, CAT scans, and EEG "is the icing on the cake".
Another anomaly concerns the relatively small amount of expense incurred in the years of caring for Sonya following Electrocution III. Mary Ann Darrah testified as an expert in nursing, medical case management and medical bill audit. According to the record, Sonya's total medical expenses since 1989 total $126,028.10. Ninety-five thousand, two hundred ninety-five dollars and sixteen cents, or 76%, was paid to Belaire for sitting services. Eight thousand six hundred eighty-seven dollars and fifty-two cents, or 7%, was paid to Dr. Robert Voogt, a rehabilitation counselor, for his expert report[19] prepared for this trial. Actual medical/pharmacy expenses totalled $22,045.42, or 17%. According to Darrah, it is inconsistent and unlikely that anyone with Sonya's devastating symptoms would incur this minimal expense. In Darrah's experience, patients with these symptoms require significant medical management, not just "sitting" expense.

PLAINTIFFS' ASSIGNMENTS OF ERROR:
1. The jury's sustaining the defendant's affirmative defense of fraud cannot stand.
2. Had the jury rejected the defense of "fraud," it would have found Haynes Best Western and Best Western International liable to Sonya Williamson for at least $10,000,000.

PLAINTIFFS' ISSUES PRESENTED:
1. Whether a "claims history" is admissible evidence to prove an affirmative defense of insurance fraud where there is no proof that any of the prior claims are fraudulent.
2. Whether expert testimony in the form of analysis of a claims history, with inferences drawn from that history to support an opinion of fraudulent conduct, is admissible evidence.
3. Whether expert testimony revealing the conduct of an independent investigation of the facts surrounding claims contained in a claims history [is] proper rebuttal evidence to combat the claims history introduced by a defendant in his or her case in chief.

FIRST ASSIGNMENT OF ERROR: The jury's sustaining the defendants' affirmative defense of fraud cannot stand.
Plaintiff rests this assignment of error on two related contentions: 1) that the verdict was based on nothing more than a history of claims and an expert's opinion concerning that history, and 2) the corollary that the evidence upon which the jury based its verdict was insufficient as a matter of law.
An evidentiary hearing on the fraud claim was held to determine, pursuant to La. C.E. arts. 104 and 404, whether sufficient *1222 and credible evidence of fraud would be provided and whether the evidence's relevancy would outweigh any possible prejudice to the Williamsons. Former U.S. Attorney Elizabeth Ainslie testified to a pattern of forty-eight suspicious claims by the Williamsons over a period of twenty-one years. Following the hearing, the trial judge determined that nineteen claims made during the past ten years, identified by the expert as possessing indicia of fraud, would be admissible at trial.
Plaintiff applied for writs, which were denied in 94-C-1345, where this Court held:
Writ denied. Relator failed to file a notice of intent or provide the trial judge with the writ application. Considering the application and response, we have no basis to disturb the trial judge's much discretion as to the July 8, 1994 judgment. Relator has a right to proffer any rebuttal evidence as to the accidents listed on Exhibit "A".
Mr. and Mrs. Haynes and their insurer rely on Easton v. Chevron Industries, Inc., 602 So.2d 1032, 1038 (La.App. 4 Cir.1992), writs denied, 604 So.2d 1315 (La.1992) and 604 So.2d 1318 (La.1992), where this Court held:
Grove's third argument is that the trial judge erred by admitting numerous accident reports of prior tipovers involving Grove cranes. Grove sought pre-trial writs on the issue of the admissibility of the reports. (No. 89-C-2049 and 89-C-2137). In this appeal Grove raises the same arguments it advanced in its previous writ applications. Because Grove's arguments have already been considered and denied by this Court, the writ disposition made by this Court acts as the "law of the case" and precludes any further consideration of this issue. Petition of Sewer [sic] and Water Board of New Orleans, 278 So.2d 81 (La.1973).
The Supreme Court case said the law of the case principle arises out of the Louisiana procedural policy against piecemeal trial of defenses or exceptions:
The law of the case principle relates to (a) the binding force of trial court rulings during later stages of the trial, (b) the conclusive effects of appellate rulings at the trial on remand, and (c) the rule that an appellate court will ordinarily not reconsider its own rulings of law on a subsequent appeal in the same case. Among reasons assigned for application of the policy are: the avoidance of indefinite relitigation of the same issue; the desirability of consistency of the result in the same litigation; and the efficiency, and the essential fairness to both sides, of affording a single opportunity for the argument and decision of the matter at issue.
Nevertheless, the law of the case principle is applied merely as a discretionary guide: Argument is barred where there is merely doubt as to the correctness of the former ruling, but not in cases of palpable former error or so mechanically as to accomplish manifest injustice. 278 So.2d at 83.
The fraud evidence in the instant case was offered as relevant evidence under La. C.E. art. 404(B) which provides:
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412 [sexual assault cases], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident,... [provision applicable to criminal prosecutions only], or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. [Part (2) relates to criminal actions involving issue of dangerous character.]
Comment (1) notes that Paragraph B generally follows the Federal Rules of Evidence, 404(b). The phrase related to integral part of act or transaction is added to the federal rule to apply to "res gestae." La. C.E. art. 404, comment (m). Note that article 404(B) relates to "acts," not only to "wrongful acts." Thus, whether the nineteen insurance claims in the last ten years were totally or in part fraudulent is not the inquiry; the mere fact that they occurred, under this article, is relevant and admissible. The evidence is *1223 also admissible to show that the Williamsons had the ability and experience to execute a complex fraudulent scheme. United States v. Hooshmand, 931 F.2d 725, 736 (11th Cir. 1991), and that Sonya was aware through her and her mother-in-law's prior experiences of the dangers of touching lamps while wet.
Appellants cite inapposite cases to support the contention that the fraud evidence was improperly admitted. In Daigle v. Coastal Marine, Inc., 482 So.2d 749, 751 (La.App. 1 Cir.1985), writ granted in part, 488 So.2d 679 (La.1986), the court held that the trial court has discretion to balance probative value against prejudice, and to admit such evidence only when the proponent has produced or will produce other evidence of fraud. Fraud was not advanced as a defense in Bunion v. Allstate Ins. Co., 502 F.Supp. 340 (E.D.Pa. 1980); Hartford Acc. & Indem. Co. v. McCardell, 369 S.W.2d 331 (Tex.1963); Knight v. Hasler, 24 Wis.2d 128, 128 N.W.2d 407 (1964); Nepple v. Weifenbach, 274 N.W.2d 728 (Iowa 1979); Nourse v. Welsh, 23 A.D.2d 618, 257 N.Y.S.2d 96 (N.Y.App. Div.1965); and Palmeri v. Manhattan Ry. Co., 133 N.Y. 261, 30 N.E. 1001 (N.Y.1892). In the remaining cases cited by the plaintiffs, the evidence was not introduced to show intent or the lack of a true "accident" (i.e., a staged incident.)
In Connell v. Connell, 889 S.W.2d 534 (Tex.App.1994), a trover and conversion claim brought in a divorce action, the court directed a verdict for the defendant, having found there was no evidence of intent to defraud. Connell does not require a directed verdict for plaintiffs herein on the fraud issue, since ample evidence was produced of intent to defraud and of actions taken by plaintiffs in furtherance of that intent.
In Harris v. M & S Toyota, Inc., 575 So.2d 74 (Ala.1991), the Court held that evidence of the AMOUNT of a prior settlement paid by defendant was inadmissible, noting that the existence of a pattern of fraudulent conduct was not at issue. Harris, 575 So.2d at 80.
In McCardell, evidence of plaintiff's prior claims was found inadmissible, absent an allegation that the prior claims or the instant claim were fraudulent. The only issue in McCardell was whether the instant accident was the producing cause of plaintiff's injuries, or whether those injuries were in fact caused by plaintiff's prior accidents. The same result obtained in Nepple and in Knight, where evidence of prior incidents was not admitted, absent a claim of fraud.
In Lowenthal v. Mortimer, 125 Cal.App.2d 636, 270 P.2d 942 (Cal.App.1954), which held similarly to the foregoing cases, the court recognized that evidence of prior incidents may be admitted where fraud is a defense. Lowenthal, 270 P.2d at 944, citing McGuire v. Village of Caledonia, 140 Minn. 151, 167 N.W. 425, 426 (1918).
It does not appear that the writ panel committed "palpable error" in denying plaintiffs' application to reverse the trial judge's admission of the fraud evidence. See, Application of New Orleans Sewerage and Water Board, supra, and Easton, supra.
Plaintiffs rely on Hock v. New York Life Ins. Co., 876 P.2d 1242 (Colo.1994) and Pickwick Park Ltd. v. Terra Nova Ins. Co., 602 A.2d 515 (R.I.1992), which interpreted admissibility standards drawn from the Federal Rules of Evidence, F.R.E. 404(b). Evidence of other acts is admissible thereunder only if it relates to material fact, adds to the probability that the material fact is true, whose logical relevance does not depend on an intermediate inference that the actor had a bad character and was acting in accordance therewith, and whose probative value is not outweighed by its inherent prejudice. Plaintiffs herein contend that the various incidents admitted by the trial court are "disparate in subject, time, place, person, and injury, unrelated in any other manner, and are not so improbable as to result in a firm belief that it would defy the laws of probability to view them as evidence of anything more than a historical records [sic] of an accident prone family that viewed insurance as a business transaction and was not averse to filing claims under all available insurance policies." (Appellants' brief, p. 12). William Porter, who was qualified as an expert in insurance investigations, and was former assistant director of fraud investigations of the Florida Commissioner of Insurance's office, gave the foregoing opinion.
*1224 At the fraud hearing, Sonya's brother, Marlin Johnson, the principal of Oak Hill Elementary School, testified that he was unaware that Sonya had ever worked as a school teacher, bookkeeper, or at a plant nursery. He described the on-again, off-again marital status of the Williamsons.[20]
He testified that he often saw his sister in February, March, April and May of 1982, the months following Electrocution I, sometimes two or three times during the week and sometimes only on weekends. At no time from February through December of 1982 did he see her in the devastated state she presented in court. He saw her following the tractor incident in August 1982, and again, at no time did she appear to have the symptoms of which she now complains.
Johnson saw Sonya without Robert at a family birthday party in May of 1989. Sonya was then living with her mother. He understood that the couple was again living separately, Robert having divorced Sonya in December of 1988. He gave similar testimony to that given to the jury during the trial concerning his visit to Sonya at the Holiday Inn near the Best Western motel after Electrocution III. Robert took him to Room 170 in the Best Western and showed him water dripping from the wall switch, which, Robert said, shorted out when Sonya touched it, causing her electrocution. At that time, Robert also told Marlin about the June automobile accident in Texas.
Marlin also testified that Robert gave false "medical reports" to Marlin's wife to be typed. When Marlin saw the content of the reports, which he believed to be false, he asked his wife not to type such reports and letters for Robert in the future.
Linda Sipco, Sonya's sister, testified at the hearing that Sonya was living with their mother prior to the second electrocution incident. Eight days after the incident (29 July 1989), she spoke to Sonya by telephone. There was no indication that anything was wrong, and Sonya did not mention the alleged electrocution or her alleged paralysis. Linda first heard of the incident on 14 August 1989 from her brother, and met her family in Alexandria to see Sonya. She pleaded with Robert to send Sonya to a doctor. She confirmed Marlin's testimony concerning Sonya's improvement during the day. She also testified that the Williamsons did not allow her to make spontaneous visits to them, but required advance notice. During these arranged visits, Sonya appeared to be ill. When she did attempt to visit without an appointment, she was not allowed in the house.
Best Western Manager Barbara Dubois testified at the hearing that the Williamsons moved three times at Robert's request before locating in Room 170. The Williamsons refused to allow housekeeping into their room, taking delivery of towels at their door. She was called to the room the day of the incident and saw Sonya lying in bed. Robert told her Sonya was shocked while changing a light bulb. She asked Robert to take Sonya to the hospital to be checked. When she asked Robert where Sonya had obtained the light bulb she was using to replace the prior bulb, he said Sonya was not changing the bulb, but touched the fixture. No one reported water leaking through the fixture, and Dubois never saw water leaking. Murphy confirmed this testimony. Dubois testified from the motel's repair orders for 1988, 1989 and 1990 that there had been no complaint of a leak from a second floor room to a first floor room in the building in which Room 170 was located or, particularly, of a leak down a light fixture in Room 170. In another building there had been a leak down the windows from Room 254 to Room 154's windows, but there had never been a leak through an interior ceiling.
The defendant introduced the deposition of Susan Gill Johnson, in which she testified *1225 that she saw Sonya at a fashion show two weeks after the incident.
Robert testified at the hearing and admitted that he made "several" claims for workers' compensation benefits while collecting social security benefits, and collected compensation benefits during that time. He testified to compensation and insurance claims from 1968. He was unable to recall any doctor's explanation for the fact that although Sonya was paralyzed and incontinent from the February, 1982 Electrocution I, she was sufficiently recovered to drive a tractor in August, 1982 (the first miraculous recovery). Neither could he explain how Sonya then was able to train horses in July of 1985 when she suffered a worker's compensation injury on the farm (the second miraculous recovery).

Fraud evidence concerning the Williamson family businesses
Because so many of the insurance claims made by the Williamson family were made against compensation carriers for their family businesses, evidence concerning whether the business entities were in fact going concerns/legitimate businesses was introduced. Dr. Jonathan Stuart Wood, associate professor of economics and finance at Loyola University of New Orleans testified, based on his examination of the business records, as an expert in economics, financial analysis and accounting. Dr. Wood testified that Sonya owned the family businesses. His examination focused on whether, during the period from 1985 to 1989, the family businesses were viable, and whether the Williamsons were financially able during that period to purchase eight vehicles with eight disability policies. He examined Sonya's personal checking account and her tax returns, Seahorse Fabricators' corporate tax returns and checking account, Seahorse Farms' business checking account and other documentary evidence, including records of Sonya and Robert's marriages. Dr. Wood defined business viability as the generation of income sufficient to purchase enough raw material, supplies and stock necessary to operate the business continuously. His analysis took into account the businesses' capital base (i.e., their assets, liabilities and sources of revenues and expenses) to predict the businesses' long term viability. Additionally, Dr. Wood applied scientific methodology in his analysis of the Williamsons' financial wherewithal and of the viability of the family businesses. This scientific methodology has developed from the 1920s into a full-blown discipline of financial statement analysis, replete with journals that publish articles relating to financial statement analysis, and subject to peer review. Faculty and other researchers in this area meet regularly to discuss and produce these research reports and analyses. Based on these statistical tests, Dr. Wood concluded that the Williamsons' family businesses were not viable business entities, Sonya did not operate the businesses and neither she nor Robert or the family businesses generated sufficient income to provide for the down payments and payment of monthly notes required for ownership of the eight vehicles.
Seahorse Fabricators, Inc. was originally chartered on 22 March 1979. The Louisiana Secretary of State revoked the charter on 15 August 1985. The charter was reinstated on 27 January 1987. Sonya was listed as owner on Seahorse Fabricators' tax returns, and Robert was listed as president. Dr. Wood's examination revealed that from 1 February 1988, through 1989 and 1990, there was no evidence of business revenues. In 1989 and 1990 there were no expenses and no operations, and the checking account was closed in March, 1989, with a zero balance. The corporation was dissolved on 10 April 1990. Thirty checks from CNA Insurance company totalling $15,108.05, and written to Arlone Belaire, Sonya (3 checks), Robert (2 checks) and Herbie Thompson (17 checks) were deposited into the Seahorse Fabricators checking account. Dr. Wood testified that no payroll checks had been made payable from the corporation to these individuals. Twenty-eight checks drawn by Maryland Casualty payable to Belaire and thirty-seven checks from the United States Treasury for Social Security disability benefits payable to Robert, Sonya and their children, and miscellaneous checks from various insurance companies totalled $54,070. He could not determine the origin of cash deposits.
*1226 The businesses wrote not a single check for such normal business expenses as payroll, wages for labor, rent, office supplies, clerical supplies, accounting or legal services, employee income tax withholding, employee social security tax payments or withholding, goods purchased, car and truck expenses, telephone, or travel expenses. Checks totalling approximately $37,000 were made payable to cash, some in amounts of $1,000, $3,000 and $5,000, and other checks were for health and racquet clubs, grocery stores, pet supplies, cosmetics, Glen Morris School cafeteria, shoe stores, a gas station and pizza emporia.
Dr. Wood's review of Seahorse Farms' financial records found a pattern similar to that of Seahorse Fabricators, Inc. He was unable to relate the revenues and expenses reported on the tax returns to the deposits or checks that went through the checking account. The tax return showed net losses of about $125,000 from 1985 to 1990.
Dr. Wood concluded that the businesses were not going concerns during the relevant period, and that the Williamsons did not have the financial capability in late 1988 and early 1989, when they purchased their fleet, to pay the down payments of $38,868 and the monthly payments of $33,437.28, and continuing annual car loan expenses of $62,650 ($5,220.90 each month).

Fraud evidence concerning Sonya's previous electrocution, subsequent quadriplegia and first miraculous recovery
Seven years before the accident in question, on 2 February 1982, Sonya and the family maid (who was also, from time to time, alleged to be a "roustabout" for the family business) were allegedly shocked in an unwitnessed accident when a CB antenna contacted an overhead power line. Robert Williamson arrived, administered CPR, rushed Sonya to the hospital, and checked her out of the hospital against medical advice. Sonya developed quadriplegic symptoms similar to those observed after the 1989 incident that is the subject of this litigation.
She saw Dr. George Middleton, complaining of inability to walk or talk, bowel and bladder incontinence, right pupil dilation and drooling. Dr. Middleton recommended immediate hospitalization, whereupon the Williamsons stopped seeing him.
Dr. Middleton asked Dr. Aretta Rathmell, a psychiatrist, to see Sonya for a psychiatric evaluation. On 2 November 1982, Robert carried Sonya into Dr. Rathmell's office. Sonya was dressed in a robe and pajamas, was unkempt, wore no make up and her hair was undone. Sonya did not try to speak or to communicate with Dr. Rathmell, and the entire history, except a brief outline obtained from Dr. Middleton, was related by Robert. Dr. Rathmell testified that Robert told her that he and Sonya had been married for four years, that she had been electrocuted, that she incurred the symptoms she presented to Dr. Rathmell, in addition to inappropriate behavior in public, and that she had been diagnosed as having schizophrenia and anxiety reaction. According to Dr. Rathmell, Robert told her that Sonya was taking Tofranil, Navane and Cogentin,[21] and had been doing better until an incident when she was riding a tractor and fell backwards to the ground and was pinned beneath the tractor. She then began to have her previous symptoms. Dr. Rathmell did not formally examine Sonya, but recommended that she go to the hospital for evaluation. She considered it to be a crisis situation and felt that there was not much she could do as a psychiatrist while Sonya was unable or unwilling to communicate with her. Dr. Rathmell recommended that Robert take Sonya to St. Patrick's Hospital's psychiatric facility, that she be admitted to have blood tests and to be seen by a neurologist, to make serial observations, day by day, one day after the other, to arrive at a diagnosis. Sonya appeared to be seriously ill and in need of hospitalization. Robert did not hospitalize Sonya, and Dr. Rathmell refused to see Sonya as a psychiatric out-patient.
In June, 1982, after Electrocution I, Sonya's neurologist found she had been devastated by the injuries. Six weeks later, she visited her OB/GYN complaining she could not find the string to remove her IUD; the OB/GYN did not note any neurological symptoms *1227 on her chart. Sonya's second miracle recovery was corroborated by plaintiffs' witness, Antoinette Appel,[22] who testified that Sonya's medical records show she delivered a baby in 1985 without mention or chart notation of the previous neurological symptoms.
On 21 September 1982, psychiatrist Dr. Walker Goodin saw Sonya, who was mute, non-communicating, sitting, rocking and staring. His impression was schizophrenic disorder, and he wrote in his notes that Sonya's claims might not be a legitimate psychological disorder, but a "prelude to a compensation gain," and Dr. Goodin refused to see her again.
Attorney David A. Hughes testified that he represented Maryland Casualty in connection with Sonya's Electrocution I compensation claim. When he met the Williamsons, in connection with obtaining court approval of the compensation settlement, Hayes found Sonya to be unable to communicate. He testified that Robert "practically carried her down to my office. She sat in the chair ... zombie-like". Sonya's court-appointed counsel was unable to engage Sonya in conversation. Hughes informed Robert that the court would not approve the settlement in view of Sonya's apparent condition, but Robert persisted, they went to court and the judge indeed refused to approve the settlement. After negotiations conducted among Maryland, Sonya's appointed counsel and Hughes, they agreed on a $45,000 settlement. Two weeks after the trial judge refused to approve the original settlement, on 7 July 1982,[23] Hughes met with the parties. Sonya had improved and was able to walk more on her own and could talk to counsel and the judge. By the next month, August of 1982, Sonya had achieved a miraculous recovery and was sufficiently recovered to be able to drive a tractor, which rolled over and caused a recurrence of the Electrocution I symptoms.[24] Dr. Rathmell advised hospitalization, which Robert and Sonya refused. Sonya received $33,000 in settlement of the tractor incident. No fact witness called by either side in Electrocution I or the tractor incident saw Sonya in a wheelchair outside the doctor's office or in the courthouse. Belaire denied ever having seen Sonya in a wheelchair, unable to talk or to walk or incontinent of bowel or bladder in 1982 as a result of either Electrocution I or the tractor incident. Marvin Williams, who worked at the family nursery in 1982, testified he never saw Sonya in a wheelchair during the time of Electrocution I and the tractor incident. To the same effect was Sonya's brother's testimony and that of her sister, Linda Sipco and Sonya's OB/GYN record. In Sonya's deposition, she couldn't recall having been in a wheelchair during that time period. Johnson denied that Sonya had ever worked on a nursery or farm. Robert admitted the nursery never sold a plant, and the family never made any money (except the compensation settlements) from the nursery. After Electrocution I and the tractor incident, the family moved on to the ranching business (Seahorse Farms).
A summary of the similarities between Sonya's two electrocutions follows:
1. Sonya was in good health prior to the incident;
2. Sonya was found unconscious by Robert;
3. Sonya had stopped breathing;
4. Robert revived Sonya when he administered mouth to mouth resuscitation and struck her chest;
5. Sonya's resuscitation was followed by a convulsion;
6. Robert drove Sonya to the hospital;
7. Sonya was alert when she arrived at the hospital;
*1228 8. Sonya had constant menstruation after the incidents;
9. Sonya complained of difficulty sleeping and eating after the incidents;
10. Sonya was unable to move without use of a wheel chair after the incidents;
11. Sonya became incontinent of bowel and bladder;
12. Sonya suffered intermittent unexplained dilation of a pupil;
13. Sonya was withdrawn, confused and depressed;
14. Sonya became uncommunicative, refusing to answer her doctors' questions;
15. Sonya was uncooperative with her examining physicians;
16. Sonya complained of right side weakness;
17. Sonya and Robert refused to submit to doctors' recommended hospitalizations;
18. Robert agreed to admit Sonya for hospitalization, but did not actually have her admitted;
19. Sonya claimed impaired memory;
20. Sonya exhibited tremor, speech defect and slurred speech during physical examinations;
21. Sonya drooled;
22. Medical personnel were not called to the scene of the alleged accident;
23. Ambulance service was not called to transport Sonya to the hospital emergency room immediately after the alleged accident;
24. Sonya did not remain overnight in the hospital following the alleged electrocution and respiratory/cardiac arrests.

Fraud evidence concerning the Williamson family's history of insurance claims
The history of other claims between 1981 and 1989 was set forth at the evidentiary hearing. The claims allowed by the trial court follow, as identified in Robert's testimony:

FALLS FROM/ON STAIRS
2 April 1981 Belaire falls down stairs while on job with Seahorse Fabricators.
21 April 1981 Robert, his father and Buckner, his 51 year old maid (or roustabout) fall to bottom of stairs while allegedly working as roustabouts on a barge that he, as president of Seahorse Fabricators, intended to but never did refurbish. Robert claims broken teeth, neck and back injuries.
4 May 1981 Robert falls down stairs while working offshore for Texas Eastern, makes compensation claim for teeth, neck and back injuries, receives $55,000 is settlement of the back claim (these are the same injuries claimed in the accidents occurring on 21 April 1981, 8 days later on 29 April 1981 and 5 days after that, 4 May 1981, a very accident-ridden two week period.)
7 July 82 Belaire falls down stairs at home at the putative Johnson Nursery (that never sold a plant) on the same day that Sonya settles her claim for Electrocution I. A month earlier, Robert had claimed in Sonya's suit that following her electrocution, and as a result thereof, the nursery had become defunct; however, a month later, he claimed Belaire was working for the nursery. Belaire receives $9,333 in settlement.

ACCIDENTS AT THE FARM
20 August 1982 Sonya falls from tractor while working for defunct nursery, relapsing, according to Dr. Middleton and Dr. Rathmell, into Electrocution I quadriplegia. Robert denied Sonya suffered these symptoms. She received a settlement and recovered.
2 July 1985 Sonya is run down by a horse while working for WW Farms, injuring her jaw and back; settlement of $17,500 received.
18 October 1987 Sonya is thrown from another horse while working for WW Farmsbreaks her nose.
8 February 1988 Robert falls from a horse while working for WW Farmsbreaks HIS nose.

ACCIDENTS ON THE ROAD
8 May 1980 Phantom truck runs family car off the road injuring the maid (or roustabout) Buckner, Robert and Sonya, who are all working in the course and scope of *1229 their employment with Seahorse Fabricators. Sonya breaks her nose and the Williamsons and Buckner receive over $100,000 for this unwitnessed accident. Williamsons claim damages for premature birth of their daughter, although attending physician denies any link between the accident and the subsequent birth. Robert testified that two days before the incident he had purchased insurance on that car, including disability policies, although he was then on social security disability. Robert admitted he lied with respect to the companies for which Buckner and Sonya were working at the time of the accident. Orthopedist Dr. James R. LaFleur examined Sonya, who complained of leg numbness and low back pain, and recommended that she be hospitalized for testing to determine cause of her problem; she did not appear for the scheduled tests and he never heard from her again. Dr. LaFleur found this very strange, and testified it had never happened to him before. He wrote to Sonya's attorney that he required testing to obtain objective evidence of Sonya's complaints, but his letter was not answered. Dr. Richard Roniger reviewed Robert's medical records in connection with this 1980 accident, which included his presentation to Dr. Hebert on 13 February 1981 with right hemiparesis, and his presentation to Dr. Cole, a psychologist, in November of 1981. Dr. Cole's report to Dr. Hebert concludes that Robert's symptoms were inconsistent, very bizarre and not consistent with a psychotic reaction. Robert agreed to return the next day for testing, but did not return. Dr. Cole wrote to the referring physician that he was suspicious of Robert's general situation and his initial impression was that Robert was "making a great deal of this incident and might tend to be manipulating in order to receive some compensation." In 1980, Dr. Latour examined Robert, who was complaining of anxiety, depression, insomnia and auditory hallucinations of a paranoid nature, and concluded he was suffering from acute schizophrenic reaction, paranoid type, and was totally disabled. Dr. Latour recommended hospitalization; Robert did not go to the hospital until 14 December 1980, and deserted the hospital within a few hours. Dr. Roniger also reviewed a letter from psychiatrist Dr. Morin from November of 1980, concluding that he could not determine if Robert's apparent speech impediment was true or "put on." Dr. Morin felt Robert was exaggerating his difficulties, perhaps as a result of malingering.
29 April 1981 Robert is injured in an auto accident, claiming broken teeth, neck and back injuries identical to those claimed in 21 April 81 accident (8 days earlier).
6 July 1981 Two months after the triple-accidents of 21 April, 28 April, and 4 May 1981, Robert and Sonya are involved in an auto accident. The Descants, who were involved in earlier accidents that were not admitted by the trial court into evidence, were guest passengers.
2 January 1985 Robert, as passenger, and Randy Smith, as driver, are involved in an auto accident. Robert claims injuries to teeth, neck and back and collects a settlement of $30,000.
14 October 1986 Robert files a U-Haul theft claim for $36,000 in property for which the supporting witnesses are Smith and William Silver. Robert collects $29,750.
10 December 1986 Robert is a guest passenger in a car owned and driven by Smith which collides with a truck operated by Robert's friend, Roger Thompson, on a lonely country road in the middle of the night. (In 1994, Robert purchased a Chevrolet pickup truck jointly with Thompson and paid Thompson's utility bills.) Robert obtained a disability policy from Globe Life prior to the accident, despite the fact that he was collecting social security disability, and received a settlement of $500 per month for five years.
11 April 1988 Randy Smith, DWI, driving Belaire's truck, hits Robert, who is driving another car owned by Belaire, on a lonely country road in the middle of the night. Robert admitted that he subsequently paid Smith's utility bills and veterinarian and boarding fees for his horses. Allstate paid full collision damages, finding the vehicles were totally wrecked. Three days later, Robert's personal injury claim was settled for $2,160.
*1230 29 June 1989 The Arlington, Texas phantom car/Thunderbird accident. Seven days before the accident, Robert asked to be added to the payroll of Seahorse Farms. Robert claimed damages for lost income and lost wages arising from that accident, although he was then collecting social security and other insurance-based disability benefits at the time. Hazel Medellin testified that shortly before the accident Robert attempted to buy a $100,000,000[25] auto liability policy from Amica Mutual Insurance Company, with medical limits of $100,000. When Robert was unable to obtain the coverage because of his driving record, Sonya applied for it, alleging on her application that she and Robert were divorced. She was also refused, because of a prior ticket. Robert originally denied these attempted purchases, but later admitted the attempts, although he claimed they sought less than $100,000,000 in coverage. When these efforts failed, in February 1989, Belaire obtained a $2,000,000 excess auto policy on her 1986 Thunderbird, in addition to an underlying $1,000,000 primary and uninsured motorist policy obtained in 1988. Belaire had four other vehicles, insured with Allstate for minimal liability limits of $10,000/$20,000. Robert admitted he was handling his mother's insurance at the time. By June, 1989, Robert and Sonya had acquired 8 cars, two donated by his mother to Sonya. Robert said all of the cars were in Sonya's name; he was then already on Social Security disability.
The Williamsons reported significant losses to the IRS for 1985, 1986, 1987 and 1988, and only $24,000 income in 1989; in the months leading up to June 1989, they paid $21,783 in down payments for various vehicles. The monthly car notes on the Williamson fleet totalled over $5,000 per month. Robert bought credit disability insurance for the fleet and two disability policies for Sonya in early 1989.[26] In addition, Robert bought a $100 per month benefit disability policy from Midland National Life Ins. Co. and a $500/month benefit disability policy from Massachusetts Mutual; Robert and Sonya secured workers compensation coverage for the family ranching business from CIGNA, to which Robert added himself on 22 June 1989. Seven days later, his brain damaged/disabled mother was driving the entire family (three adults and three children, Dixie, Abner and Jolie Williamson), packed into the heavily insured Thunderbird, in Arlington, Texas when she was run off the road by a phantom vehicle. All except Belaire claimed injuries; only Sonya went to the emergency room. The Williamsons saw their family doctor, Dr. Ardly Hebert,[27] to be checked out after the accident. They did not tell Dr. Hebert about Sonya's previous Electrocution I or the tractor-related concussion/quadriplegia. Robert and Sonya obtained statements from Dr. Hebert "To Whom it May Concern" that they were disabled from working in their occupations.[28] This information was not given to Globe or *1231 the Social Security Administration, but was sent to CIGNA, the Seahorse Farms compensation carrier.
Amica denied the claims arising out of the Arlington Thunderbird accident, in part because of a "no contact" defense (the car had not been struck by the phantom vehicle.) Robert dropped Sonya's claim, while continuing to pursue his and his children's claims.
Dr. M. Raid Hajmurad, an Alexandria neurologist, testified that he examined the children and Sonya following the Arlington accident. The children complained of headaches and dizziness. Their parents provided Dr. Hajmurad with the history of the accident. Abner complained of post-concussional headache syndrome, a well-known syndrome most typical in elderly head injury patients. Dr. Hajmurad testified that, according to medical literature, the syndrome "for unknown reasons... will disappear, ... after litigation that is what they mention in the textbook after litigation is finished. But it is well known in neurology literature, and for some reason it is present and has been common." Dr. Hajmurad found no objective signs of injury, and testified that if the ER doctor who examined the family immediately after the accident had asked and been told that the children were not injured, "then probably some of the symptoms are not real." Dr. Hajmurad saw Abner quite a few times, and ordered an MRI and a Bear study. Abner did not show up for several appointments, including the MRI and Bear study. An EEG test produced normal results.
Dixie complained to Dr. Hajmurad of headache, dizziness and two fainting spells of thirty seconds duration unaccompanied by seizure activity. Robert told the doctor that Dixie had lost consciousness in the accident. Dr. Hajmurad testified that in his general experience, a parent would and should notify ER personnel that a child lost consciousness, in order that appropriate tests might be conducted. The doctor's notes show Robert and Sonya had been giving Dixie Noctec, a hypnotic sedative/tranquilizer Schedule IV drug, to help her to sleep. Dr. Hajmurad would not prescribe this drug for regular use on a nine-year-old like Dixie because of its side effects, which include central nervous system symptoms such as dizziness, lethargy, and tiredness. Dr. Hajmurad's neurological examination of Dixie, which included an EEG and CAT scan, was normal. He continued to see Dixie, but observed no objective evidence of injury. At that point, he asked Robert to allow further tests, including a bone scan and blood work, to determine what was really wrong, but Dixie did not return.
Dr. Hajmurad examined Jolie for the same complaints, headaches and dizziness. Robert told the doctor that Jolie had not lost consciousness, but might have had a brief seizure because her eyes rolled back, her eyes were fluttering, and she was unresponsive. Dr. Hajmurad testified that Robert definitely should have reported these symptoms of seizure to the ER personnel. Jolie, who was four years old at the time, was also receiving Noctec. Dr. Hajmurad observed no objective evidence of injury. By July, 1990, Jolie was doing well and was discharged from Dr. Hajmurad's care.

OTHER ON-THE-JOB ACCIDENTS
2 February 1982 Electrocution I: Sonya, carrying a CB antenna with Buckner, touch an electrical wire. Both are allegedly working for Johnson Nursery, which had not yet sold any plants. Robert denied at trial that Sonya suffered quadriplegia symptoms after Electrocution I. Sonya's claim was settled ultimately on 7 July 1982 for $45,000 and she miraculously recovered.
16 September 1985 Robert falls into a hole a few days after beginning a new job with Lafayette Steel, sustains back injuries and collects $95,000 in settlement.
22 October 1987 Electrocution II: Belaire is electrocuted while changing a light bulb while her hands were wet at her employer's house, fell from a ladder and sustained orthopedic injuries. Belaire received $120,000 on her compensation claim, but lost her civil suit. The month before this incident, Belaire purchased a worker's compensation policy on herself and three disability policies on three newly-purchased vehicles.
William Silver testified that he knew Sonya and Robert as customers in his family's department store in Alexandria, where Robert spent at least $20,000 in a given year, including *1232 such luxury items as furs, jewelry and, on one occasion, an $8,000 or $9,000 Piaget wristwatch. He testified that the Williamsons always drove nice cars, but he was never told that they were in the business of buying and selling automobiles.
Silver and Marvin Williams testified that they saw Sonya physically active feeding the horses at the Williamsons' ranch. The Williamsons' employee, Carl Williams, testified that he saw Sonya feeding the horses and doing paperwork for the horse farm. He also testified that Sonya twice helped him buy a car by using her credit; she did the same for his three brothers. Marvin Williams testified that Sonya bought his school clothes and paid his school fees every year, and gave him and his brothers bicycles, basketballs and footballs for Christmas.
Sonya paid some of Marvin Williams's car notes; Robert admitted they helped the Williams brothers (who testified on behalf of the Williamsons) with car down payments and car insurance premiums; Robert admitted that he helped Randy Smith with his car notes and utility bills; Robert admitted he helped Roger Thompson, who had been involved in another Smith/Williamson accident, with HIS car notes and utility bills.
Silver testified that he has extended substantial credit to Robert, and, even after Robert told him the family needed money, he extended an additional $3,182 in April, 1994. When Robert reached the maximum amount of credit at the store, Silver charged Robert's purchases to Silver's own account, and received a check from Robert in the amount of $250, on which Silver noted the name of his horse, "Rennie", and the words "vet and feed" in payment of part of that purchase; in fact, the money was not paid on account of the horse, for veterinary services or feed. Silver testified that Robert would often shop with him and Robert would give Silver "tips" of $200.00 for his shopping advice. Silver also rented a large home on Polk Street in Alexandria with Robert and Belaire in summer of 1989, where Robert and his family spent weekends in May and June. He could not explain why the Williamsons chose not to live in this house, which they were renting, instead of in the Best Western motel in Alexandria at the time of the electrocution incident.
Robert testified before the jury concerning the facts surrounding the various claims, alleging that he did not stage them and did not intend to harm anyone in connection with the various accidents and claims arising therefrom. When testifying, he admitted he was then taking Vasotec for blood pressure, and Entrafon and Valium for nerves. He had been taking the nerve medicines for over ten years, off and on. He claimed he had been taking the Vasotec ever since an alleged stroke in 1991, for which he had not been hospitalized. Robert said he had been obtaining about a hundred Entrafon tablets every two months or so. He is currently being treated by Dr. Hebert for anxiety and schizophrenia. He denied having told Dr. Rathmell that Sonya was taking Navane and Cogentin, and claimed that he, not Sonya, was taking those medications.

Sonya's Mother-in-Law is electrocuted (Electrocution II) under circumstances similar to Sonya's second electrocution (Electrocution III)
St. Paul alleges that the electrocution accident involved in this litigation (ELECTROCUTION III) was "rehearsed" by Robert Williamson's mother, Ms. Belaire, on 22 October 1987, when she allegedly received an unwitnessed electrical shock (ELECTROCUTION II) while attempting to change a light bulb while working as a nurse/sitter.
Electrocution II (Belaire as victim) occurred on 22 October 1987, 21 months before Electrocution III (Sonya as victim). The two electrical incidents show marked similarities:
In Electrocution II, the victim secured workers compensation coverage a few months before the accident and purchased two vehicles insured for credit disability one month before the accident. In Electrocution III, workers compensation coverage was obtained for the victim as a Seahorse Farms employee, and the victim purchased disability coverage on six automobiles within months before the accident. In both cases, the victim alleged electrical shock while attempting to change a light bulb, although in Electrocution III Sonya and Robert changed that story *1233 shortly after the incident. Neither incident was witnessed. In both cases, the first person to arrive on the scene was Robert. In both cases, the victims alleged total disability due to organic brain damage (in Electrocution II there were additional allegations of orthopedic injury), and in both cases, it was alleged that the victim needs to be cared for by family members.
Shortly before Electrocution II, Belaire purchased three new cars, one for herself, one for Robert and one for Robert's brother, all with credit disability insurance policies; Robert filled out an application for worker's compensation insurance coverage for his mother one month before the incident. Following the incident, she filed disability and compensation claims with the insurers, claiming she was disabled from pursuing her occupation as a nurse/sitter. Despite that claim, she submitted invoices to Sonya's compensation carrier for nurse/sitting services she allegedly rendered to Sonya immediately after Sonya's alleged electrical shock 21 months later (Electrocution III). Seven months after the commencement of her "services" to her daughter, Belaire and Robert testified to a Ville Platte jury in Belaire's personal injury case that Belaire was incapable of working as a nurse/sitter and could not even take care of herself and had to be watched over by other family members. In the instant case, Belaire testified that she moved in with the Williamsons in 1989, and was caring for Sonya through 1990, when Belaire's personal injury suit came to trial. At Belaire's own trial, she testified that she was then living on Graceland Street in Abbeville, because she was in too much pain to live with the Williamson family. When confronted with this contradictory testimony, Belaire initially denied the previous testimony. She was also confronted with testimony she offered at her own personal injury trial that Robert had to take care of her because she had difficulty doing housework and driving. Belaire identified her signature on various disability policy applications.
During the course of her trial testimony, Belaire complained of high blood pressure, and her videotaped deposition was read to the jury in lieu of further examination at trial. During the deposition, she was on Buspar, Mellaril, Procardia and Prozac. She admitted having sent monthly statements to Globe Insurance certifying to her continuing disability, although she was at the same time collecting payments from Sonya's insurers for sitting services. An examination of the transcript of the videotaped deposition and of Belaire's live testimony reveals sufficient inconsistencies concerning where she was living, the reasons for her choice of living arrangements, purchase of vehicles and disability policies, the nature of her nursing accreditation and filing disability statements while collecting payments for having rendered sitting services to justify the jury's determination that her testimony was not worthy of belief.

Multiple claims for disabilities arising out of on-the-job injuries allegedly sustained while parties were working, usually for Williamson family businesses or for Williamson family members, although receiving disability benefits
Additional motive and intent evidence concerns Robert's activities while receiving Social Security disability benefits. Specifically, in September 1985, Robert was working for Lafayette Steel and suffered an on-the-job accident for which he received compensation benefits through September 1986. While receiving BOTH Social Security benefits and compensation benefits, Robert applied to Globe Life for credit disability insurance in connection with a vehicle purchase. Two months later, Robert and Randy Smith had a late night road accident, and Robert obtained four years of disability benefits from Globe, paying off the car loan. During those four years, 1986-1989, Robert periodically reported to Globe that he was still disabled, sending his reports via Federal Express and Airborne Express, avoiding potential federal mail fraud liability. During this same period of disability, he represented to Allstate (the insurer in the collision with Randy Smith) that he was employed by Thermal Dynamics, during a period when he was receiving compensation benefits from Lafayette Steel and disability payments from Globe and Social Security. He admitted at trial that he was not employed by Thermal Dynamics, that his brother worked there and his wife had a *1234 financial relationship with the company; Robert denied at trial any knowledge of why an employee of Thermal Dynamics wrote to Allstate verifying Robert's employment with that company. He also admitted that the representation concerning his employment by Thermal Dynamics overlapped the time he was still collecting worker's compensation benefits from a Transamerica insurance claim. After having presented his claim for lost wages to Allstate for the 2 April 1988 Randy Smith accident, and while receiving Globe and Social Security disability benefits, Robert asked to be added to the payroll of Seahorse Farms one week before the Arlington phantom car accident.
Robert admitted that during the time he began receiving Social Security benefits, which amounted to $1600 per month at the time of trial, he worked: on his family farm, on construction jobs, as a certified welder, as an offshore welding inspector, as a licensed private investigator for plaintiff's attorneys, and in a plant nursery. He testified that Mr. Vale, counsel for Haynes Best Western, "must be" in charge of the Social Security Administration, and recommended to them that Robert's benefits be terminated.
A month after the Arlington phantom car accident, while collecting under the farm's compensation insurance for the on-the-job injury sustained in Arlington, and two weeks after having arrived at the Alexandria Best Western, Sonya suffered another on-the-(farm)-job injury that is the subject of this litigation.

TESTIMONY BEFORE THE JURY OF FRAUD EXPERTS

Defendants' Fraud Expert: Elizabeth Ainslie
Elizabeth Ainslie holds a bachelors degree from Smith College and graduated in 1968 from Harvard Law School. She taught at the University of Baltimore, worked for a Boston law firm, held a federal judicial clerkship, and practiced as an Assistant U.S. Attorney in Philadelphia, where she specialized in fraud prosecutions. As chief of the fraud section, she supervised prosecutors, reviewed evidence and charges and participated in deciding whether to prosecute cases. Ainslie managed approximately 200 fraud cases, half of which involved insurance fraud. Approximately a dozen of these cases involved organizational insurance fraud, the intentional falsification of different claims by groups of individuals over a large period of time, which she personally handled. In 1985, she worked as a Special Assistant United States Attorney on organizational insurance fraud claims.
Ainslie currently owns an independent firm that consults with insurance companies seeking evaluations for individuals who have been accused of insurance fraud. Ainslie's firm also defends insurers where fraud is suspected. In this capacity, Ainslie has handled over a hundred situations involving suspected fraud, has worked with law enforcement in many of the claims, and has taught courses on fraud evaluation and the indicia of fraud.
Her federal fraud experience was primarily based on prosecutions for violation of the federal mail fraud statute, and on bank, tax and securities fraud. Ainslie was accepted as an expert in evaluation of organizational insurance fraud.
Ainslie explained her procedure to the jury. She examined the records of the accident in question and other accidents involving Sonya and her family, to determine whether she could reach an opinion as to whether Sonya's Electrocution III showed indications of insurance fraud. According to her testimony, the standard used for determining indications of insurance fraud, and those indicia in the instant case are as follows:
1. Whether a large amount of insurance was obtained within a reasonably close time before the claimed accident: Sonya had taken out a very large number of insurance policies within six months to a year before the accident, without explanation other than an intention of staging an accident, given the Williamsons' economic circumstances. Further, all of the eight automobile disability policies were written on Mrs. Williamson, and she obtained two additional disability policies. Such coverage is relatively expensive, and Sonya was, at the time, relatively young and in good health. Ainslie found it unusual that, under these circumstances, *1235 Sonya would obtain disability insurance in excess of the credit disability she had on the vehicles and in addition to her workers' compensation coverage as an employee of Seahorse Farms.
2. Whether there was an independent witness to the accident, such as a police officer: There were no independent witnesses, such as police or Emergency Medical Technicians because the Williamsons called none. The absence of such a call casts further doubt on the validity of the claim, since in cases of cardiac arrest and lack of breathing, persons normally call for emergency personnel.
3. Whether any evidence disappeared since the time of the accident that might have aided in the investigation: Robert testified that the Seahorse Farms records on which Sonya was allegedly working were destroyed by fire, flood or rodent infestation.
4. Whether the physical evidence is consistent with the story being told: Sonya's inconsistent medical symptomology, the lack of a short circuit in the wall outlet in Room 170, the lack of prior or subsequent reports of water leaking through the ceiling of Room 170 and the prior quality assurance examination of Room 170 demonstrate inconsistencies with Robert's story. The claimants' version of the incident changed over time. Witnesses testified to having seen and spoken to Sonya during the month following the accident, at which time Sonya did not demonstrate the onset of the symptoms currently at issue.
5. Whether there is a lack of indisputable and serious injury: Although Sonya presently appears terribly disabled, she appeared to have been similarly disabled seven years earlier in a previous electrocution. Ainslie found it bizarre that Sonya suffered two serious electrocutions without independent witnesses or extended hospitalization. The fact that Sonya apparently recovered from the previous electrocution (Electrocution I) within a month or so of the time she received her insurance settlement enhanced the indicia of fraud. Ainslie felt this strongly indicated fraud.
6. Belaire's electrocution, similarly involving a light-bulb (Electrocution II) less than two years before Electrocution III, strengthened Ainslie's opinion that the Williamsons staged this accident to obtain an insurance settlement. Ainslie also noted that changing a light bulb does not present such an inherent danger that it would likely cause severe injury within less than a two year period to two members of the same family at different locations.
In addition to these primary indicia of fraud, Ainslie testified to secondary reasons supporting her conclusion that the Williamsons staged Electrocution III. The Williamsons owned a home at 1912 Polk Street in Alexandria during the same time period of time they were staying at the Haynes Best Western motel in the same city. Also, in previous accidents involving Sonya, Robert and Belaire, the same pattern existed of obtaining more insurance than made sense under the circumstances and acquiring substantial insurance proceeds in settlement. After reviewing the Williamson family's income, Ainslie verified that insurance proceeds constituted a very substantial proportion of the family's total income.
Further indication of organizational insurance fraud existed in the fact that various members of the Williamson family and friends played differing roles in different accidents. For example, Belaire sometimes played the role of the driver and sometimes the role of the victim; Ms. Buckner, the Williamsons' maid/roustabout, suffered alleged injuries in a number of previous accidents, generally playing the victim's role; Mr. Smith participated in a number of different accidents acting as driver, passenger and witness. In a 1980 accident, Sonya brought Robert to the doctor and played the same role with respect to him that he subsequently played with respect to her: Robert sobbed when Sonya left the room, appearing fearful of hospitalization, largely incoherent and requiring Sonya to act as his "translator". This case presents the same scenario, but Sonya and Robert have reversed roles. Also, Sonya played the same mediatory role with respect to Belaire in Electrocution II.
*1236 Further evidence of Sonya's active role in the fraudulent enterprise exists in her having signed tax returns using the name Sonya Johnson in January of 1990, six months after the accident and at which time she was allegedly devastated and paralyzed, in a totally unimpaired handwriting. Additional evidence of Sonya's fraudulent participation included: the purchase of the vehicles in her name, the purchase of credit disability and regular disability policies, the payment of the insurance premiums, and Sonya's voluntary statements to doctors and emergency room personnel regarding her condition. According to the documentary evidence, Sonya and Robert shared in more than $600,000 questionably received from insurance proceeds.
No evidence exists that the family businesses needed the number of employees claiming benefits from various on-the-job accidents. Further, Seahorse Fabricators and Seahorse Farms did not seem to have a genuine business existence: the alleged business entities did not write checks for salary, rent or taxes, nor did the entities operate any business other than as vehicles for insurance fraud. Ainslie testified that the insurers would have had difficulty detecting this type of fraud early on because: the Williamsons purchased insurance from many companies for which they made many claims; Sonya used various names to procure policies and make claims including Sonya Johnson and Sonya Williamson; Belaire also used different names including Arlone Ardoin, Arlone Bellaire, Arlone Tate and Arlone Williamson; Robert also used different names including Bobby Williamson, Bob Williamson, Robert Johnson, Robert Belaire and Robert Bellaire. In sum, the Williamsons moved often, used different insurance companies, settled claims for modest amounts and agreed to settle claims before going to trial.
Based on the documentary evidence she reviewed, she gave the opinion that indicia of fraud existed and that the motel incident was staged or fraudulent. Ainslie's expert opinion was based on the record of objective evidence of fraud. Ainslie testified that it is not within her expertise to evaluate the credibility of witnesses but rather to evaluate the facts of record.
Ainslie found indicia of the fraudulent pattern to which she testified in the previous claims allowed by the trial court as evidence:
8 May 1980 accident: similar credit disability policy; no independent witness; persons involved are Robert, Sonya and maid/roustabout Buckner, all of whom appear in other accidents; Sonya claims same damage (to nasal septum) she claimed in subsequent accident; Robert is emotionally distraught and Sonya must act as his mediator with doctor.
2 April 1981 accident: unusual that a phantom business, a nursery that never sold a plant, would have employed a housekeeper and a bookkeeper; Robert testified that the nursery was trying to go into business, the same story he told about Seahorse Fabricators.
20 April 1981: Robert, Belaire and Buckner have same pattern of falling, claiming injuries as employees of non-existent business, Seahorse Fabricators; first of at least two claims by Buckner of serious eye injury, although at least one of the doctors determined the eye damage of which she complained was congenital.
22 October 1987: Belaire bought new cars with large credit disability policies, a workers' compensation policy, which is unusual for a self-employed person.
June 1987 Arlington, Texas accident: Belaire bought millions of insurance coverage on the Thunderbird, while maintaining minimal insurance on other vehicles she owned; Sonya and Robert attempted to obtain considerably expanded insurance shortly before the accident; all six members of the family were riding in the heavily insured car; Robert was added to the family business's payroll about a week before the accident.
11 April 1988 accident: Robert is involved in an accident with his friend, Randy Smith; both vehicles were registered in Belaire's name; there were no witnesses to late-night road accident. This is similar to the 10 December 1986 late-night accident, again involving Smith and Robert and their friend, Roger Thompson. Smith was also involved in the 14 October 1986 U-Haul theft claim, this time as a witness. For these friends *1237 to run into each other in separate late-night accidents is, in Ainslie's view, an indicator of fraud.
Ainslie summarized the basis for her opinion, as the increased insurance bought before the accidents; the repetition of injuries (for example, three electrocutions, Robert breaks his teeth several times, Sonya breaks her nose twice, Robert breaks his once; Buckner injures her congenitally damaged eye at least twice); lack of independent witnesses; stories that don't hang together; disappearance of significant evidence; and the fact that Robert avoided use of the U.S. mails by using Airborne Express and Federal Express, thereby attempting to avoid liability under the federal mail fraud statute.
Ainslie testified that staged accidents are sometimes hard to control, and a participant may actually get hurt.

Plaintiffs' Fraud Expert: L. William Porter, II
L. William Porter attended college at Coastal Carolina Community College, East Carolina University, Florida Keys Community College and obtained a bachelor's degree in Business Administration from the University of Miami in 1977. He attended the University of Miami Law School and eventually obtained his law degree from Florida State University in 1986. He worked traffic homicides and cargo thefts while working for the Highway Patrol from 1972-1975. From 1983 to 1986, while he was in law school, he was employed as an investigator in the Criminal Fraud Division of the Florida Department of Insurance, but had no authority to decide whether a file merited prosecution. He worked for some time[29] as assistant division director for the Florida Insurance Department's Division of Insurance Fraud, which he described as a police or law enforcement command position. He was involved in the actual prosecution of two cases. After two or three years, he returned to the private practice of law. He has spoken to Florida prosecutors about economic crimes and insurance fraud, and helped write a Florida Department of Insurance manual for insurance fraud investigators.
In preparing to testify in the instant case, he reviewed depositions, adjustors' reports, Ainslie's deposition, the claims file, hospital records, sworn statements and deposition summaries, police reports, and interviewed between 15 and 20 fact witnesses. He went to the scene of seven or eight of the accidents at issue. His procedure, unlike Ainslie's, was to interview the witnesses to each accident and essentially to determine whether, in fact, fraud could be proved; Ainslie examined the records, without making individual credibility determinations with respect to each participant and witness, relying only on the objective evidence contained in the records. The trial court accepted Ainslie's methodology, and limited Porter's testimony to conclusions drawn using only objective evidence. Porter testified before the jury that he believed his method would produce a better evaluation of fraud indicia.
The trial court accepted Porter as an expert in fraud evaluation, investigation and prosecution. Porter gave the opinion that he did not believe that Electrocution III was faked or staged. He felt it was unlikely that the Williamsons would stage this accident before the claims arising out of the Arlington, Texas auto accident had been resolved. He believed that Sonya's physical symptoms could have been caused by electrocution, and that it was unlikely that Sonya would have lived the life of an invalid, convincing her children that she was so incapacitated, for a period of years in order to obtain recovery in this litigation.
Porter agreed with Ainslie that purchase of a large number of cars with disability insurance was an indicator of a problem, but believed that the cars were not purchased with the intention to keep them; this begs the question, if they were for resale, why disability policies were purchased on each vehicle. Porter also believed that the Williamsons' willingness to settle the claim for Electrocution I at a low level was evidence that the claim was not fraudulent. However, *1238 Ainslie testified that organizational fraud schemes succeed where the participants are not too greedy. Porter believed the Arlington automobile accident was not fraudulent because he "couldn't recall ever working a staged accident ring or any kind of physical-contact-type insurance fraud, where people intentionally endangered the well being or lives of their children." Porter admitted that filing a lawsuit claiming damages that were not actually sustained in an accident that was in fact faked or staged would be an indication of fraud, and testified that fraud could be inferred from testimony that Sonya did not exhibit any symptoms through two weeks after the alleged onset of her symptoms the day after the incident. He admitted that some of the Williamsons' claims raise "red flags to an adjustor or fraud investigator, [and] would require additional investigation". Porter also admitted that fraud schemes can go wrong, causing injury to the participants.
On cross-examination, Porter admitted that in forming his opinions, he did not review the Amica Mutual Insurance Company underwriting or claims files relating to the Arlington, Texas accident, he reviewed only part of the CNA claims files, he did not review the CNA underwriting file or the Maryland Casualty disability claims files connected with the various Williamson vehicles, and he could not recall if he reviewed the Morris Temple Insurance Agency records (one of Robert's insurance agents), or the Transamerica Insurance claims file. He did not review the medical depositions and did not know if Sonya sought medical treatment as a result of any of her claimed accidents, and admitted that failure to see a doctor could be an indicator of fraud. Porter did not review any of Robert's disability records. He was aware that Robert had some sort of mental disability, and was not aware that Robert, during this period of disability, asked to be put on the payroll of family business Seahorse Farms a week before one of his compensation accidents. Porter was unaware likewise that Robert purchased disability insurance shortly before the family's and friends' accidents.
Plaintiff suggests that the jury's verdict, finding that Sonya was injured in Room 170 and that the accident was staged or fraudulent, is inconsistent:
The fact of injury by electrocution in the Best Western Motel (the jury's finding) cannot be overturned absent manifest error; the jury's finding of "fraud," which could only have been based on the claims history and opinion evidence interpreting the claims history (since this was the only thing offered by the defendants to support their claim of fraud other than the evidence which was offered to disprove injury by electrocution) is legally infirm, not to mention manifestly erroneous. (Appellant's brief, page 9.)
This is a misstatement of both the jury's verdict on special interrogatories and the nature of proof offered at the trial. The jury responded to the following interrogatories:
1. Do you find by a preponderance of the evidence that the plaintiff proved that Sonya Johnson Williamson sustained injuries at the Haynes Best Western of Alexandria motel on July 21, 1989?
[Response checked] YES
The interrogatory does not mention electrocution. It asks only whether Sonya sustained injuries on the date of the incident, not how those injuries were sustained. The evidence supports an inference that she was injured by Robert's commencement of the administration of neuroleptic drugs during the days immediately following the incident; likewise, the jury could have concluded from the evidence that Robert either with or without Sonya's complicity, staged the incident, and that Sonya was actually shocked to some undetermined degree. In evaluating the merit of this assignment of error, what the interrogatory does not ask is as important as what it asks. It does not ask if she was injured as a result of any negligence by defendants or a defective condition of the premises. It does not ask if she was electrocuted as plaintiffs claimed. It does not ask if her injuries were caused in any way by defendants.
The jury also unanimously found fraud:
2. Do you find by a preponderance of the evidence that the defendants proved that *1239 the incident of July 21, 1989 was a result of a staged accident or fraud?
[Response checked] YES
Based on the record taken in its entirety, these responses are not inconsistent, and are supported by credible evidence.
The Louisiana Civil Code defines fraud in article 1953:
Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.
This fraud, like its French counterpart, "dol", need not be a criminal act. La. C.C. art. 1953, Comment (c). Two elements are necessary to prove fraud: an intent to defraud and actual or potential loss or damages. Transworld Drilling Co. v. Texas General Resources, Inc., 604 So.2d 586, 590 (La.App. 4 Cir.1992), writs denied 608 So.2d 174 (La. 1992).
The standard of proof of fraud is found in La. C.C. art.1957:
Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence.
The commentary to this article provides in part:
(b) In some instances, Louisiana courts have recognized the full import of C.C. Art. 1848 (1870). Thus, in Griffing v. Atkins, 1 So.2d 445, 450 (La.App. 1st Cir. 1941), the court said: "Whilst it is true that in Article 1848 of the Civil Code it is provided that fraud, like every other allegation, must be proved by him who alleges it, however, that same article further provides that `it may be proved by simple presumptions, or by legal presumptions as well as by other evidence. The maxim that fraud is not to be presumed, means no more than that it is not to be imputed without legal evidence.' Courts have always acknowledged how difficult it is for one to prove fraud by positive and direct testimony, realizing full well that those who indulge in it generally prepare themselves in such a manner as to cover up and leave no traces of their practice behind them." 1 So.2d 445, at 450 ...
Planiol addresses proof of fraud in a similar manner with respect to the French source articles, 1116 and 1353:
Article 1116 provides that fraud is "not to be presumed and must be proved." On the other hand Art. 1353 authorizes all the means of proof to establish fraud, even simple presumptions. These two dispositions are in no way contradictory. In saying that fraud "is not to be presumed," Art. 1116 simply means to impose the burden of proof on the person demanding the nullity; in saying that the fraud can be established "by presumptions" Art. 1353 authorizes that special kind of proof which is drawn from the circumstances of the fact such as compromising acts done by the author of the fraud, or material facts which may have remained. 2 M. Planiol, Traite Elementaire de Droit Civil No. 1068, Eleventh Edition (1939) translated by the Louisiana State Law Institute with the authority of Librairie Generale de Droit et de Jurisprudence, Paris.
Prior to the enactment of Article 1957 in 1984, the Louisiana Supreme Court had held that because of the serious nature of a charge of fraud, the person alleging fraud was required to provide "clear and convincing" or "exceptionally strong" proof. See, e.g., Succession of Lyons, 452 So.2d 1161 (La.1984); Hall v. Arkansas-Louisiana Gas Co., 368 So.2d 984 (La.1979), aff'd. in part, vacated in part on other grounds, 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). There is no room for such an interpretation under Article 1957. La. C.C. art.1957, comment (b). Circumstantial evidence, including highly suspicious facts and circumstances surrounding a transaction, may be considered in determining whether a fraud has been committed. Transworld Drilling Co. v. Texas General Resources, Inc., supra, 604 So.2d at 590.
Appellants contend that the introduction of information concerning the Williamson family's claims history resulted in a finding that Sonya was guilty merely by association. This contention appears to suggest that Sonya saw no evil, heard no evil and spoke no *1240 evil in connection with the insurance fraud being perpetrated by the Williamson family and its associates. However, it is clear that Sonya was a direct, willing participant, as victim, witness, or employer, in the claims history. Her active participation is evident from the record, and we find no foundation for appellants' suggestion of guilt merely by association.
Appellants contend that because none of the prior accidents was defended for fraud by the respective insurers, and were settled, they may not be "collaterally attacked" in this litigation. However, the settlements are not being attacked herein. These defendants, indeed, have no standing to set aside the settlements and there is no suggestion that the settlements should be or could be revisited in this litigation. The cases cited by appellants in brief deal with the principle that judgments or settlements may not be collaterally attacked. Since the judgment does not purport to set aside the settlements, we find no merit in appellants' argument.
Appellants contend that the evidence of prior claims is inadmissible, citing cases from other jurisdictions precluding evidence admitted for the sole purpose of showing litigiousness, or that a plaintiff was "accident prone." Those cases are inapposite, since the evidence was introduced in this case to show a pattern and practice involving acquisition of large amounts of insurance, followed in close order by an accident, usually either unwitnessed or witnessed by a party involved in some capacity in other related accidents, for which injuries are claimed but in connection with which no extended hospitalization occurred, and which usually resulted in a relatively modest settlement readily accepted by the allegedly injured party. Viewing the record as a whole, we cannot conclude that the trial judge abused his discretion in weighing the relative probative value of the evidence against its potential prejudicial effect and deciding in favor of its admissibility.
Appellants contend that the testimony of Elizabeth Ainslie as a fraud expert was improperly admitted. The Louisiana Code of Evidence provides:
If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. (Emphasis supplied.) La. C.E. art. 702.
The Louisiana Supreme Court has recently pronounced its standard for acceptance of expert testimony pursuant to La. C.E. art. 702:
Experience alone is sufficient. [citations omitted]. The evidence proved that Bloch [the expert witness] had substantial information which supported the reasonable findings of the trial court. A trial judge has wide discretion in determining whether to allow a witness to testify as an expert, and his judgment will not be disturbed by an appellate court unless it is clearly erroneous. [citations omitted]. Mistich v. Volkswagen of Germany, Inc., 95-0939 (La.1/29/96), 666 So.2d 1073, 1079, rehearing granted Apr. 26, 1996.
While the court in Mistich did not advert to its earlier decision in State v. Foret, 628 So.2d 1116, 1121-23 (La.1993), we note that in the latter opinion, the Louisiana Supreme Court accepted the test for reliability of expert scientific testimony set out by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), requiring the trial court
to act in a "gatekeeping" function to "insure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." (citation omitted) ... The reliability of expert testimony is to be ensured by a requirement that there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. This connection is to be examined in light of "a preliminary assessment" by the trial court "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts at issue." Id. The court went on to make some suggestions as to how a court could fulfill its gatekeeping role. These involve whether or not the *1241 technique had been subjected to peer review and/or publication, the "known or potential rate of error", the existence of "standards controlling the technique's operation", the technique's "refutability" or, more simply put, testability, and, finally, an incorporation of the Frye general acceptance in the scientific community as only a factor in the analysis. (citations omitted). State v. Foret, 628 So.2d at 1122.
The Foret opinion makes reference to "expert scientific opinion." The testimony offered by Ms. Ainslie and Mr. Porter is not readily susceptible of analysis under the Daubert/Foret principles. Each of these witnesses had experience in evaluating claims for the purpose of detecting fraud, either for further investigation in the case of Mr. Porter or for investigation and prosecution in the case of Ms. Ainslie. Their field is not one that has spawned official journals, nor have experimental procedures and protocols been established. We conclude that the trial court performed his function of weighing the probative value of the testimony of each of the experts against the potential for prejudice to the appellants and to the appellees and did not abuse his discretion or make a manifestly erroneous determination when he allowed each expert to testify. By limiting each of the fraud expert witnesses to testimony based solely on the objective records of each of the claims that he found admissible, and by allowing full examination of each witness's qualifications before the jury, the trial court exercised its gate-keeping function.
Appellants contend that the evidence of prior claims so tainted the jury's verdict that the verdict should be set aside. There is ample suggestion of suspicious circumstances without resort to the prior claims to support the finding of fraud. In a case involving admission of inadmissible evidence before the jury, this Court held:
The admission of this evidence was improper, but not prejudicial to the point of being reversible. Admission of hearsay evidence is not reversible error where, as here, the record contains ample other evidence on which the trier of fact could base its findings. Meadoux v. Hall, 369 So.2d 240, 245 (La.App. 4 Cir.1979), writ denied 369 So.2d 1366 (La.1979).
In this case, the evidence of fraud involving the instant claim itself is overwhelming. Evidence arising in the context solely of the incident giving rise to this litigation, from Sonya's sister and brother, from present and former employees of the motel, from the physicians who examined Sonya and from plaintiffs themselves preponderates in favor of a finding of fraud. The expert testimony showing an unsuccessful attempt to alter evidence by burning the electrical wire in the lamp gives further support to the jury's verdict. The similarities between Sonya's first and second electrocutions and the testimony concerning her two miraculous recoveries from symptoms of quadriplegia similar to those of which she now complains add further support. Even were we to find that the expert testimony was improperly admitted and the evidence of the prior claims was inadmissible, there was no prejudice to appellants. This latter evidence was merely "icing on the cake." A review of the evidence de novo, eliminating all the testimony to which appellants object, would result in an overwhelming preponderance of evidence of fraud, supporting the jury's verdict.

SECOND ASSIGNMENT OF ERROR: Had the jury rejected the defense of "fraud", it would have found Haynes Best Western and Best Western International liable to Sonya Williamson for at least $10,000,000 in damages.
Because of our conclusion that the first assignment of error is without merit, this assignment of error is moot.

BWI'S ASSIGNMENTS OF ERROR
Because of our conclusions with respect to Appellants' assignments of error, BWI's assignments of error are moot.

CONCLUSION
The jury's determination is not inconsistent with the medical and expert testimony. The jury found that Sonya was, indeed, injured in the Best Western Motel, whether by a staged electrocution gone bad or by a minor or non-existent shock followed by Robert's administration of paralyzing drugs to make a case for quadriplegia.
*1242 Indeed, even without the evidence of Robert's and Belaire's fraudulent conduct, and the other claims made by Sonya and members of her family, there is adequate evidentiary support in the record for the jury's verdict.
No medical expert, whether called by the plaintiffs or defendants, had seen or read of an organically brain damaged electrocution patient who presented with the package of symptoms demonstrated by Sonya. There was medical testimony that it is impossible for a patient to have four years of normal MRI and MRA imaging tests while having Sonya's symptoms, particularly when one of the MRI tests was run continuously for 24 hours. There was medical disagreement as to whether even the 1993 films showed any abnormality, and the jury could have rejected the results of the controversial brain mapping test. Even if the jury believed the latter test demonstrated abnormality in the basal ganglion, there was uncontroverted testimony that this could have been caused by side effects of neuroleptic medications and/or the physical position assumed by Sonya during the test procedure. The drug side effects, according to the medical testimony, could last longer than the period of time during which the medication would be evident in drug-screening tests. The doctors who testified for Sonya admitted that their conclusions were based, to a substantial degree, on the history of the incident given by Robert, including his claim that Sonya had been electrocuted and had suffered anoxia caused by cardiac and respiratory arrest. Several of these medical experts did not have the benefit of the emergency room liver and enzyme tests which demonstrated conclusively that no cardiac arrest or electrocution had occurred. Also before the jury was Sonya's largely unexplained refusal to submit to extended hospitalization to determine more precisely her medical condition. Equally troubling was the medical testimony that Sonya's symptoms sometimes appeared on the left and at other times on the right side, and that her linguistic tests were suspicious, showing results that actually improved during the course of the testing procedure, rather than deteriorating, as expected, as the patient tired.
The physical evidence provided the jury with reasonable credibility choices between divergent views of the evidence. The only source of the water appellants claim poured through the lamp causing Sonya's electrocution was the exterior air conditioning unit serving Room 270, directly over the Williamsons' room. There was expert engineering testimony that because of the construction of the building, a vertical air space and the distance between the air conditioning unit and the lamp preclude the conclusion that the water migrated to the lamp as claimed by appellants. There was conflicting testimony before the jury on the issues of whether the wall socket controlling the lamp was defective and whether the lamp socket was so designed that it could not cause electrocution unless it were submerged, for example, in a bathtub. Under Louisiana's manifest error standard, we may not disturb the jury's choice between the conflicting engineering and medical expert opinions.
The jury found as a fact that the incident was fraudulent, or staged. Our review of the record in its entirety convinces us that the jury's findings are reasonable in light of that record and are supported by ample evidence in the record, taken as a whole. We find no prejudicial error in the trial court's evidentiary rulings and no manifest error in the judgment below.
AFFIRMED.
Barry, J., dissents with reasons.
BARRY, Judge, dissenting with reasons.
The trial judge properly admitted evidence of Sonya's prior insurance claims in which Sonya suffered symptoms of a similar nature under circumstances similar to this case. My concern is that the jury heard evidence about numerous claims made by Sonya's family, none of which relate to her subject claim. I am satisfied that the prejudicial effect of the extraneous, unrelated claims had a devastating effect on the jury's verdict. I therefore dissent due to this reversible error.
The majority cites Daigle v. Coastal Marine, Inc., 482 So.2d 749 (La.App. 1st Cir. 1985), writ granted and rev'd in part on *1243 other grounds, 488 So.2d 679 (La.1986), immediately after stating that cases cited by appellants are inapposite. That suggests Daigle is inapposite. Though Daigle held that evidence of plaintiff's prior claims was improperly admitted because "there was no showing of fraud or similarity of the accidents except that each involved plaintiff's back," id. at 751, Daigle provides a pertinent discussion as to when prior claims evidence is admissible:
Louisiana lacks jurisprudence that delineates the proper use of prior claims evidence at trial. However, E. Cleary, McCormick's Handbook of Law of Evidence, § 196, pp 466-467 2d ed.1972 notes the difficulty of determining when such evidence should or should not be allowed.
[T]he need for the exposure of fraudulent claims comes in conflict with the need for the protection of innocent litigants from unfair prejudice. At two extremes the practice is fairly well agreed upon. Thus, when it is sought to be shown merely that the plaintiff is a chronic litigant, or a chronic personal injury litigant, the courts consider that the slight probative value is overborne by the danger of prejudice, and they exclude the evidence. At the other extreme, if it is proved not merely that the party has made previous claims or brought suits but that the former claims were similar to the present claim and were false and fraudulent, then the strong relevance of these facts to evidence the falsity of the present claim is apparent and most courts admit them.
The intermediate situation is the difficult one. The evidence offered is that the present party, now suing for a loss claimed to be accidental, such as a loss of property by fire, or personal injury in a collision, has made repeated previous claims of similar losses. Here the relevance is based on the premise that under the doctrine of chances repeated injuries of the same kind are unlikely to happen to one person by accident. On the other hand this kind of evidence is prejudice-arousing and standing alone would seldom be sufficient to support a finding of fraud. It seems that the judge, balancing in his discretion probative value against prejudice, should admit the evidence only when the proponent has produced or will produce other evidence of fraud. [Emphasis added.]
Daigle, 482 So.2d at 750-751, quoting McCormick's Handbook of Law of Evidence, § 196, pp 466-467 (E. Cleary ed., 2d ed.1972).
Under Daigle (quoting McCormick), such evidence is admissible when the proponent proves that prior claims were similar and fraudulent. In the intermediate situation, when there is evidence of repeated prior claims of a similar nature, the evidence is relevant to show that plaintiff has exceeded his likely chances of repeated, accidental injury of the same kind. In such an event, the evidence may be admitted where the proponent "has produced or will produce other evidence of fraud."
McCormick on Evidence § 196, at 833-834 (John W. Strong, ed., 4th ed.1992), reiterates that the trial judge must balance the probative value of the evidence against its prejudice and admit the evidence "only if the probability of coincidence seems negligible or if the proponent has distinct evidence of fraud." McCormick acknowledges that the existence of a series of accidents involving the same person does not make it less probable that the next accident actually occurred:
If the model holds, the low probability that a long series of similar, negligently caused accidents will happen to the same person does not lower the probability that a particular one ... occurred. After all, the fact that the probability of the series of ten heads [from a coin toss] is only 1/1024 does not change the probability (1/2) for a head on a particular toss, and the fact that nine heads in a row have appeared does not make it less probable that the coin will come up a head on the tenth toss.
Id. at 833 n. 6.
McCormick notes another significant conclusion:
that something other than a series of independent accidents caused by someone else's negligence has befallen the claimant. There are two possibilities. The plaintiff could be honest but accident-prone....

*1244 The difficulty with this reasoning is that it runs squarely up against the bar to character evidence as proof of conduct on a particular occasion....
The remaining possibility is that plaintiff is fraudulently disposed or at least "claim-minded." But using this inference to conclude anything about the claim in issue also violates the character rule. Consequently, if an abnormal incidence of claims is an acceptable indication that the present one lacks merit, a forthright acknowledgement that this constitutes a true exception to the rule against using character to prove conduct seems called for.
Id.
The majority states that Bunion v. Allstate Insurance Co., 502 F.Supp. 340 (E.D.Pa.1980) is inapposite. I disagree, although Bunion is distinguishable. In Bunion the defendant filed a motion in limine to admit evidence of plaintiff's other accidents to show that plaintiff was "claim-minded." That is a back-handed way of saying that the claim is fraudulent. The court cited McCormick, determined that the case presented a "middle ground" situation, and held that the possibility of prejudice outweighed the probative value of the evidence because the defendant offered no evidence of fraud and did not explain when the evidence would be used.
Unlike Bunion, the defendants offered evidence which might suggest fraud. Testimony concerning Sonya's condition following the 1982 electrical injury and tractor accident is conflicting. Some doctors and insurance representatives believed that Sonya was incapacitated, but her brother and mother-in-law said she was not in a wheelchair or incapacitated. Sonya's brother saw Sonya from February to December 1982 (after her first electrical injury and the tractor accident) and said she was not physically devastated. Sonya's sister testified at the fraud hearing that she spoke to Sonya eight days after the July 1989 electrocution and Sonya did not mention the accident. Considering that evidence and the similarity of Sonya's symptoms, the trial court did not err by admitting evidence of Sonya's prior insurance claims.
My dissent is about the admissibility of evidence which relates to family members' insurance claims. I disagree with the majority that such evidence is admissible to show motive, intent, or plan. Those claims do not constitute a wrong or act committed by Sonya and are irrelevant. Even if relevant, the prejudicial effect of that evidence far outweighs its probative value.
The majority also holds that evidence of fraud in the family business is relevant to show proof of a fraudulent plan, though the majority does not cite a basis. That evidence is unrelated to Sonya's claim and does not come under La. C.E. art. 404(B).
Even when fraud is alleged, as here, the family's propensity toward an accident(s) has no probative value as to Sonya's intent. Jurisprudence recognizes the clear danger of admitting evidence of a plaintiff's "bad character," but allows an exception where it is offered for another purpose and the probative value outweighs the prejudice. The majority allows evidence of the family's character and connects that to Sonya's alleged fraud. Even if it somehow constitutes an "other act" by Sonya, which it does not, it seems that any relevance is far outweighed by its prejudicial effect.
Weiskopf v. Bond, 739 F.Supp. 1084 (E.D.La.1990), cited by Haynes Best Western of Alexandria and its insurers, supports that conclusion. In Weiskopf, plaintiffs were involved in an automobile accident with some acquaintances. Shortly before the accident the policy limits on both vehicles had been significantly increased and most of the plaintiffs had applied for disability and health insurance. State Farm alleged fraud. Plaintiffs filed a motion in limine to limit testimony concerning similar acts by plaintiffs and by others not involved in the litigation. Evaluating the evidence under Fed.R.Evid. 404(b), the court admitted evidence of other similar acts by the plaintiffs, but disallowed evidence of past acts which were not committed by plaintiffs:
Although similar act evidence would be relevant were the plaintiffs charged with committing the past similar acts, such extrinsic act evidence is not relevant when it is parties unrelated to this litigation that *1245 are charged with committing the past acts. Even if relevant, the prejudicial impact of introducing evidence of acts by other people as evidence of the plaintiffs' modus operandi clearly outweighs any possible probative value.
Weiskopf, 739 F.Supp. at 1087.
Considering the magnitude and extent of the extremely prejudicial evidence, the trial court committed reversible error by admitting the family's prior claims into evidence.
The majority does not address the plaintiffs' argument concerning the fraud experts: a) that allowing a witness to testify as an expert on fraud usurps the factfinder's function; and b) that the trial court improperly limited Porter's testimony after qualifying him as an expert.
I respectfully dissent.
NOTES
[1] Defendants requested production of this paperwork. Robert Williamson replied that it had been lost in a flood, by fire or by rat infestation.
[2] United States v. Robert T. Williamson, Criminal No. 94-10001-01 (W.D.La. Feb. 22, 1994).
[3] The Williamsons' assignments of error are set forth later in this opinion.
[4] See, LSA-Const. Art. 5, section 10(B).
[5] Expertise in biomedical engineering relates to knowledge of the operation of electrically operated medical devices and systems, usually in a hospital setting.
[6] Dr. Joseph Dyro admitted that if the lamp were properly grounded, it would be unlikely that the electrical accident could occur.
[7] Roy Flora, an independent hospitality industry consultant who testified as an expert in quality assurance in that industry, testified that in his twenty-five year experience in the industry he had never seen or heard of the phenomena called water migration as alleged in this litigation. He reviewed the BWI quality assurance report for 27 April 1989, and opined that BWI complied with industry standards in performing that inspection, that Room 170 was inspected, that the inspection included inspection for stains on the ceiling, that the report revealed no such stains or leaks into the room.
[8] At trial, Robert denied having taken Marlin to Room 170.
[9] Prior to the Electrocution III incident, Robert arranged for Sonya to execute a general power of attorney in his favor, giving him control over her legal affairs.
[10] Silver testified Sonya was in a wheelchair prior to the show. Silver's maintenance employee, Roosevelt Fairley, testified that he saw Sonya in a wheelchair at the show.
[11] Dr. Leo de Alvare, an expert neurologist, testified that dilation caused by placing nasal drops in the eye could last from 6 to 8 hours. Dr. Frances Dyro testified pupil dilation could also be caused by administration of Transderm-Scope and Neo-Synephrine. Dr. Philip Lindsay testified that pupil dilation could also be caused by rubbing scopolamine on the eye.
[12] Following a prior automobile accident in Arlington, Texas, Robert presented to Dr. Hebert with similar symptoms, including arm weakness and speech defects. The Williamson children also reported textbook neurological symptoms to neurologist M. Raid Hajmurad following the Texas accident, but the Williamsons resisted diagnostic testing to confirm that the symptoms were "real."
[13] Dr. Hebert also testified to having treated Belaire for Electrocution II. His report was introduced into evidence, and relates that he obtained the history from Robert, and the similarities were as discussed hereinbelow, revealing circumstances similar to Sonya's second electrocution (Electrocution III). It was Dr. Hebert's opinion that Belaire was continuously disabled and unable to return to her prior occupation as a nurse/sitter, at least up until 1992.
[14] Dr. Harper, plaintiffs' neurologist, testified that the American Academy of Neurology says that there is little, if any, utility in brain mapping, at a clinical level. The process is still being investigated as a research tool. A 1989 A.A.N. position paper states, "EEG brain mapping is of limited usefulness in clinical neurology. The tests are best used by physicians highly skilled in EEG in conjunction with analysis of the concurrent polygraph EEG," and the Association has not changed its position since then. There is no accepted standard for brain map testing, and no certification for the specialty. Dr. de Alvare testified that the jury is still out on brain-mapping, and it has generally been replaced by more useful and practical tests such as are done in hospital sleep labs. He said that normality and abnormality of brain map results is not well defined. The test has been accepted, however, by courts in Florida, New York and Louisiana. Dr. Wand admitted that Sonya had been diagnosed several times using the terms "schizophrenia" and/or schizophrenic disorder, and he admitted that schizophrenia can affect the results of EEG and brain maps, and there is controversy on the subject of that interrelation in the literature.
[15] Dr. Leo de Alvare testified that the Babinski test is a well-known neurological examination and that a patient could voluntarily produce a positive result.
[16] This medical imaging technique allows the physician to see blood vessels without performing an invasive angiogram.
[17] We use the term "miraculous" to describe these recoveries which were achieved without the aid of substantial medical intervention.
[18] Robert admitted Sonya never sought medical treatment for incontinence.
[19] Voogt developed Sonya's life care plan without having reviewed any medical records except Dr. Martinez' report. He considered none of the medical evidence available from the other treating/examining physicians that would define Sonya's future medical condition to a reasonable degree of medical certainty.
[20] After Sonya and Robert were married a few months, she was sent home to her parents with her belongings. Sonya showed them papers indicating that Robert had been interdicted and could not have been legally married. Robert visited her at home for a while and they were subsequently remarried before a Ville Platte Judge. The Judge allowed Robert to file the license, but it was never filed; a few months later, Sonya was again sent back home, heartbroken and disoriented. She went to live in Missouri, but Robert located her, they came back and were again remarried before a Judge, a month before their son, Abner was born.
[21] At trial, Robert denied having told Dr. Rathmell that Sonya was taking these medications.
[22] Dr. Appel is not on the staff of any hospital and has no hospital privileges in her state of practice, Florida. She became a consultant to a Florida rehabilitation institute less than two weeks prior to this trial.
[23] While the settlement was being formalized in court on 7 July 1982, Robert's mother-in-law fell through steps on the Johnson's Nursery premises, allegedly while employed there by Sonya. She filed a claim with Maryland Casualty. Hughes prepared that settlement petition as well.
[24] Hughes handled this compensation claim against Maryland Casualty as well. Maryland Casualty settled this claim for approximately $33,000 as well as Sonya's mother-in-law's claim for the nursery step incident for $7,678.76, on 27 December 1982.
[25] Robert denied the amount, but the application is clearly for $100,000,000.
[26] Robert E. Shaffer, Motors Insurance Corporation/MIC Life Insurance Corporation claims manager, testified from his company's records that Sonya obtained a $28,500 benefit policy 016896 on 29 March 1989 with $500 monthly disability benefit; she obtained a $28,600 benefit policy 016251 on 29 March 1989 with $500 monthly disability benefit; she obtained decreasing term life insurance with disability coverage with monthly benefit of $493.77 policy 016254 on 20 June 1989; she obtained a single life policy for $22,997 with $403.46 monthly benefit, policy 016252, on 7 June 1989; she obtained a $28,500 benefit policy 016257 with $500 monthly benefit on 19 June 1989; she obtained decreasing term life policy 016256 with disability monthly benefit of $472.51 on 23 June 1989; she obtained policy 016255, single life decreasing term coverage of $30,735.18, monthly disability benefit of $500 on 20 June 1989. Shaffer testified that Sonya's claims under these policies were settled for roughly $107,009.08.
[27] Dr. Hebert's daughter is married to Robert's brother, and Dr. Hebert has a grandchild of this marriage.
[28] In 1977, Dr. Hebert was appointed by the court to examine Robert in connection with the latter's interdiction. Dr. Hebert wrote: "... It is my opinion that he [Robert] is incapable physically and mentally to properly administer and make decisions concerning his personal affairs. The duration of his present condition is undetermined. I've recommended to him that he consult with his psychiatrist as soon as possible. We'll have a more complete understanding of his condition and prognosis after the complete psychiatric evaluation." The interdiction continued from 4 February 1977 to 12 July 1978.
[29] He testified on direct examination to a two or three year term; on cross-examination, he admitted he held this position for less than two years.